Larry O. ATWATER, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF CONSUMER & REGULA-
TORY AFFAIRS, Respondent.

USAA Casualty Insurance
Company, Intervenor.

No. 88–220.

District of Columbia Court of Appeals.

Submitted Feb. 28, 1989.
Decided Oct. 24, 1989.

Philip G. Schrag was on the brief, for petitioner.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the response was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., filed a response to Order to Show Cause.

David F. Grimaldi, Washington, D.C., was on the brief, for intervenor.

Before FERREN and SCHWELB, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

This case presents two difficult issues arising from the cancellation of petitioner Larry O. Atwater's automobile liability insurance policy. On the merits, the question is whether an insurer is relieved from the requirement that it provide the insured with thirty days notice of the cancellation of a policy, *see* D.C.Code § 35–2109 (1988), when the insurance is financed by a premium finance company. Before reaching this issue, however, we must determine whether a District of Columbia Department of Consumer and Regulatory Affairs (DCRA) administrative law judge, Honorable Sharon Nelson, exceeded her jurisdiction in deciding it. We conclude that Judge Nelson properly exercised jurisdiction. On the merits, we affirm her decision.

I

## THE FACTS

Our story, as told by Judge Nelson in her comprehensive findings, begins a few days before Christmas in 1984, when Mr. Atwater came to Metro Motors, a dealership in Washington, D.C. operated by Cole Brothers Enterprises, to purchase a car. He spoke with Mr. Joe E. Cole, the manager, who assisted him with the purchase of a used Ford Grenada. Mr. Cole explained that, in order to drive the vehicle off the lot, Mr. Atwater would have to purchase liability insurance, as required by District of Columbia law.

To assist Mr. Atwater in obtaining insurance, Mr. Cole called National Fidelity Insurance, Inc. (National Fidelity), an insurance broker. He arranged with National Fidelity that Mr. Atwater would receive liability and collision coverage, for which he would have to pay an initial premium of $188.00. Mr. Cole assured National Fidelity that he would collect the premium from Mr. Atwater, and the broker's representative gave him a binder number over the telephone, thus providing immediate coverage. Mr. Atwater, who was to receive financing through Mid–Atlantic Finance Corporation (Mid–Atlantic), a premium finance company, paid Mr. Cole $115.00 in cash and a negotiable promissory note for the balance of $73.00.[1] The binder number was duly recorded on the bill of sale. Mr. Cole also told Mr. Atwater that the full cost of the insurance would be $600.00, and that he could pay that amount in eight equal installments. Mr. Atwater, who had already made a down payment on the Grenada earlier in the day, drove it away.

On New Year's eve, Mr. Atwater, having determined that his Christmas Grenada was, in second-hand car lingo, a "lemon," returned it to the dealership. Mr. Cole arranged for the insurance to be transferred to a Ford Pinto, which Mr. Atwater accepted in exchange. Mr. Atwater contacted the offices of National Fidelity and Mid–Atlantic to try to complete the neces-

---

1. Mr. Cole retained as his firm's commission $30.00 of the $115.00 from Mr. Atwater. Nei-

ther he nor anyone else told Mr. Atwater that he was being charged a commission.

sary paperwork. He testified that he made inquiries, but that he never received a payment book or other insurance documents. An officer of National Fidelity told Mr. Atwater that he was insured and that a power of attorney had been "signed on his behalf" to execute any application or finance agreement for his car insurance.

In early January 1985, Mr. Atwater's liability insurance coverage was placed with United States Services Automobile Association (USAA) through the District of Columbia "assigned risk" program. Mr. Atwater only made the initial down payment of $115.00 for his policy. He never paid Metro Motors the $73.00 due on the promissory note, nor did he pay any further premiums. He likewise made only three payments of $50.00 each on the car itself. Mr. Atwater testified that on the basis of his past experience with insurance policies, he believed that $188.00 would be sufficient to insure him for more than one month but for less than three months.

After being assigned Mr. Atwater's account, USAA mailed him a copy of his policy, the term of which was twelve months. In February 1985, Mid–Atlantic, not having received the premiums that had become due, and acting pursuant to its power of attorney, gave notice to USAA that Mr. Atwater's policy should be cancelled.[2] In conformity with this communication, USAA cancelled the policy effective February 20, 1985, without sending any notice of its action to Mr. Atwater. USAA did send a confirmatory letter to Mid–Atlantic, together with a refund of a pro-rated portion of the financed amount.

On or about May 6, 1985, Mr. Atwater was in an automobile accident which destroyed the Pinto and damaged two other automobiles. He has acknowledged his fault, and his responsibility for the accident is undisputed. The owners of the other two vehicles were compensated by their own insurers, who now seek recovery against Mr. Atwater on a subrogation theory.[3] Mr. Atwater notified National Fidelity of the claims, but he was advised that his policy had been cancelled in February 1985 for non-payment of his premiums.

On May 20, 1985, Mr. Atwater and the director of the DCRA filed with that agency's Insurance Administration a petition pursuant to the Consumer Protection Procedures Act (CPPA), D.C.Code §§ 28–3901 to 28–3908 (1981 & 1989 Supp.), against Cole Brothers, National Fidelity, Mid–Atlantic and USAA. They claimed that the respondents had violated provisions of various statutes relating to insurance and consumer protection, and sought extensive relief, including a requirement that USAA and others pay any claims arising out of Mr. Atwater's accident, as well as compensatory and punitive damages, civil penalties, fines, and the initiation of license revocation proceedings. Not all of the claims involved insurance matters, and the petition was transferred within the agency from the Insurance Administration to the Office of Adjudication. The case was assigned to Judge Nelson for resolution.

Judge Nelson granted motions to dismiss by National Fidelity, Mid–Atlantic and USAA before hearing any testimony. She concluded that no claims had been stated against these respondents upon which the petitioners would be entitled to any relief. She subsequently heard evidence on the claims against Mr. Cole and Cole Brothers, but granted Mr. Atwater only a small portion of the relief he had requested, primarily because USAA's cancellation of Mr. Atwater's policy could not be causally related to these respondents' violations of the law.

Mr. Atwater has appealed to this court[4] only the dismissal of his eighth and twelfth

---

2. Mid–Atlantic presented internal records reflecting that a notice of cancellation had been mailed to Mr. Atwater and to National Fidelity on February 20, 1985. Mr. Atwater denied that he received any notice of cancellation before he *reported an accident to National Fidelity in May of 1985.* Judge Nelson stated that she was "not convinced that [Mr. Atwater] did not receive

notice." Mr. Atwater does not appeal this finding.

3. The other insurers have deferred filing suit on their claims pending resolution of the present case.

4. Although the Director of DCRA was a co-petitioner in the administrative proceeding, the

causes of action against USAA. In his eighth cause of action, he alleges that USAA failed to provide him with thirty days notice of the cancellation of his policy, as allegedly required by D.C.Code § 35–2109(b). In his twelfth cause of action, he contends that USAA never provided him with a copy of the provisions of D.C.Code § 35–2109, which he claims it was required to do by § 35–2109(m).

## II

### THE AGENCY'S JURISDICTION

■ Both of the causes of action which remain in the case, and with respect to which Mr. Atwater is appealing, are based on D.C.Code § 35–2109. Although that statute is entitled "Consumer Protection," it is a part of the District's Compulsory No–Fault Motor Vehicle Insurance statute, D.C.Code § 35–2101 *et seq.* (1988) (hereinafter the No–Fault Act). The proceeding before Judge Nelson was, however, instituted pursuant to the Consumer Protection Procedures Act. The "unlawful trade practices" enumerated in that Act, *see* § 28–3904, do not include violations of § 35–2109. Concerned that under these circumstances, the administrative law judge may have been without jurisdiction to entertain the claims, we issued an order on March 10, 1989 directing Mr. Atwater to show cause why the proceeding and the appeal should not be dismissed. In response to the Order to Show Cause, briefs were filed by Mr. Atwater and by the District of Columbia but not by USAA.

Mr. Atwater and the District agree that the DCRA had jurisdiction over the matter and that the proceeding should not be dismissed. The District proposes, however, that the case be remanded to the agency for administrative resolution by the Super-

intendent of Insurance [5] rather than by the administrative law judge. We conclude that Judge Nelson properly exercised jurisdiction over the case.

### A. *The statutory scheme.*

The Consumer Protection Procedures Act is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers. This court has called it "ambitious legislation." *Howard v. Riggs Nat'l Bank,* 432 A.2d 701, 708 (D.C.1981). Among its purposes is to "assure that a just mechanism exists to remedy *all* improper trade practices." § 28–3901(b)(1).[6]

The Act contemplates that its procedures will be invoked, not simply to enforce its own substantive provisions, but also those of other consumer protection laws. The Act gives the Office of Consumer Protection authority, after investigation, to "determine whether a person has executed a trade practice in violation of *any law* of the District of Columbia." § 28–3903(a)(1), (13). The Office is empowered to investigate "what trade practice actually occurred" and whether the trade practice violates *"any statute, ...* rule of common law, or other law, of the District of Columbia." § 28–3905(b). If the Office finds that the trade practice violates a law "within the jurisdiction of the Office," § 28–3905(d)(1), (g), it must initiate an administrative proceeding with an autonomous Office of Adjudications,[7] describing "each trade practice which occurred in violation of District law, *the law it violates,* and the relief sought." § 28–3905(e)(3). After the Office has filed its administrative complaint, every case "filed with the Office and within its jurisdiction shall be decided in accordance with the procedures and sanctions of this section [of the Consumer

agency has become a formal respondent. We are told that this has occurred because Mr. Atwater is appealing from a ruling on an administrative law judge of that agency.

5. The functions of the Superintendent of Insurance were transferred to the Department of Consumer and Regulatory Affairs by Reorganization Plan No. 1 of 1983. *See* D.C.Code § 35–1301 Annot. (1988). The District is thus

proposing a transfer of the case from one office within DCRA to another.

6. In this opinion, all italics in the text of the statutes cited have been added by the writer. Unless otherwise identified, section citations are to the District of Columbia Code.

7. Formerly, a "section on hearings."

Protection Procedures Act] *notwithstanding that a given trade practice, at issue in the case, may be governed in whole or in part by another law which has different enforcement procedures and sanctions.*" § 28–3905(*l*). If an administrative law judge finds that the respondent has violated "a law of the District of Columbia within the jurisdiction of the Office," he or she may issue an order granting relief under the Act and, in addition, relief based "in whole or part upon a violation of a law ... regulating a type of business." § 28–3905(g)(6).[8] The remedies available for the consumer under the Act may include contract damages, restitution, or other "just" relief, as well as a cease-and-desist order. § 28–3905(g)(1), (2).[9]

In addition to providing administrative procedures and remedies, the Act authorizes a consumer to bring a civil action for violations of the Act and of other statutes "within the jurisdiction of the Office." § 28–3905(k)(1). It provides for recovery of treble or punitive damages, attorneys' fees, and other relief. *Id.* The Act also explicitly authorizes consumers "injured by a trade practice in violation of a law ... within the jurisdiction of the Office [to] exercis[e] any right or seek [ ] any remedy to which the [consumer] might be entitled or [to] fil[e] any complaint with any other agency." § 28–3905(k)(2).

The Act defines the term "trade practice" broadly, to embrace "any act which does or would create, alter, repair, furnish, make available, *provide information about,* or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services." § 28–3901(a)(6).[10] "Goods and services" are defined to include "any and all parts of

the economic output of society." § 28–3901(a)(7).

Although § 28–3904 makes a host of consumer trade practices unlawful, its list of such practices was not designed to be exclusive. The remainder of the statute obviously contemplates that procedures and sanctions provided by the Act will be used to enforce trade practices made unlawful by other statutes. If the § 28–3904 listing were exclusive, the references in § 28–3905 to to other laws and to the common law would serve no purpose.

### B. *Legislative history.*

The legislative history of the Act reinforces the straightforward reading of the statute itself as a ˙measure designed to provide procedures and sanctions for violations of consumer protection statutes generally.

The Committee Report provides that under § 28–3903, the Office's authority includes "the power to determine whether a person has executed a trade practice *in violation of any law of the District and [to] remedy any such violation* determined to have been carried out, rather than in terms of any specific laws." Committee on Public Services and Consumer Affairs, Report on Bill No. 1–253, Mar. 24, 1976, at 16. The Report explicitly states that the listing in § 28–3904 is to be "*in addition to other consumer-related laws* already on the books in the District." *Id.* at 17.

The Report also emphasizes that, in terms of enforcement machinery, the Office is not restricted to enforcement of the Act alone. It states that the only matters outside the enforcement jurisdiction of the Office are "trade practice[s] beyond any District law"; activities explicitly exempted by § 28–3903(c)(2); and activities that are

---

**8.** Section 28–3905(g)(6) also authorizes the agency to "refer the case for further proceeding to an appropriate board or commission."

**9.** The respondent may also be assessed a civil penalty of up to $1,000.00 per violation, payable to the District. § 28–3905(i).

**10.** *In the Report of the Committee on Public Services and Consumer Affairs on Bill No. 1–253, Mar. 24, 1976 (hereafter the Report) at 14,*

this definition of "trade practice" was paraphrased to include "any economic act between a consumer and a merchant." "Merchant" is defined in § 28–3901(a)(1) as anyone who sells, leases, or transfers consumer goods or services. In light of our disposition of this appeal on other grounds, we need not decide the question, raised by USAA before the agency, whether an insurance company is a merchant within the meaning of the Act.

not trade practices, or do not involve both consumers and merchants. *Id.* at 20.[11] In its discussion of those provisions of the Act which authorize consumers to pursue judicial remedies in the Superior Court, the Report likewise states:

> The subject matter jurisdiction of the Office ... may coincide with, and does not limit, that of other agencies of the District Government. On the other hand, the *powers of other agencies may not be construed to detract from the powers of the Office,* under any provision of the bill, to obtain relief for consumers and compliance with District laws.

*Id.* at 23.

The Report notes that the enforcement mechanisms in the Act will not be duplicative of present law when the trade practice involves professions licensed or supervised by existing boards and commissions, because

> [t]he boards and commissions generally have no power to order the money damages and injunctive relief which the Office has the power to do, so there is no duplication of functions proposed in this bill so far as the boards and commissions go.

*Id.* at 21–22.

Finally, with respect to D.C.Code § 28–3905(*l*), which provides that the procedures specified in the Act may be used even when other laws provide "different enforcement procedures and mechanisms," the Report states that this section "allows other consumer protection enforcement laws to continue side-by-side with this one, while leaving the procedures and sanctions

provided by section [28–3905] whenever the Office deals with or follows up on a complaint." *Id.* at 24.[12]

\*    \*    \*

Although Judge Nelson concluded in a prior case that she lacked jurisdiction over the kinds of claims here at issue, *see* Drymalski, *Consumer Protection: Administrative Decisions Affecting the D.C. Consumer Protection Procedures Act of 1976,* THE WASHINGTON LAWYER, Nov./Dec. 1987 at 50, 51, citing *District of Columbia Dep't of Consumer and Regulatory Affairs v. Hunter,* No. 85–SOH–086 (DCRA, Dec. 1, 1985), both she (by her decision in the present case) and those responsible for the enforcement policies of the agency construe the Act in a manner consistent with its language and legislative history as discussed above. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (courts normally defer to agency's construction of its authorizing statute, if reasonable). We conclude, as did Judge Nelson, that she had jurisdiction over Mr. Atwater's claims under the No–Fault Act.

### C. *The District's proposal to transfer the case to the Insurance Administration.*

Believing that he had insurance problems, Mr. Atwater filed his initial petition with the Insurance Administration of the DCRA. The agency transferred the case to the Office of Adjudication, presumably because that Office had authority to resolve all issues relating to all parties while

---

**11.** This explanation of the meaning of "matters outside the jurisdiction of the office" forecloses any suggestion that the converse term "within the jurisdiction of the office," *see, e.g.,* § 3905(d)(1), (g), was designed to exclude practices not specifically enumerated in § 28–3904. *See, e.g., Firestone v. Howerton,* 671 F.2d 317, 320 n. 6 (9th Cir.1982) ("when the same terms are used in different sections of a statute, they receive the same meaning").

**12.** Since 1976, the Council has amended the Act to make it available to enforce five subsequently-enacted statutes. Violations of those statutes have expressly been made unlawful trade practices under D.C.Code § 28–3904(y), (z), (aa),

(bb), and (cc) (1989 Supp.). The explicit inclusion of these five later-enacted statutes in § 28–3904 could be construed as offering support for the proposition that other later-enacted laws (such as the No–Fault Act), which were not included in § 28–3904, were not intended to be enforceable under the Consumer Protection Procedures Act. We agree with the District, however, that this conclusion would place too much reliance on legislative silence. The District suggests several possible explanations, the most persuasive of which is that "an uneven approach to legislation over a thirteen-year period may simply reflect legislative oversights rather than deliberate action."

the Insurance Administration could not address claims unrelated to insurance practices. Now, more than four years later, the District asks us to remand the case for *de novo* resolution by the Superintendent of Insurance. The District's proposal is premised on flawed assumptions, and we decline to follow it.

■ The District argues that the CPPA was designed "to *supplement* procedures and remedies available under other consumer protection laws, ... not to supplant them, when the only difference between the administrative enforcement schemes in the two statutes is the administrative decision-maker." (Emphasis in original). Assuming, *arguendo*, that this proposition is correct, it has no application to the present case. The remedies available under the CPPA are far broader than those under the No–Fault Act. The latter statute provides that if the Superintendent of Insurance determines that a policy was improperly cancelled, then the insurer shall be required to pay all the claims for which it would be liable under the policy. The remedy, in other words, is to reinstate the policy. § 35–2109(d)(1) and (i)(3).[13] Under the CPPA, on the other hand, an administrative law judge may not only grant the relief available from the Insurance Administration, but may also issue a cease and desist order, award contract damages and restitution, impose costs, and grant preventive relief against future violations. § 28–3905(g). Accordingly, contrary to the District's assumption, the identity of the administrative decision-maker is not the only difference between the two enforcement schemes.

The District asserts that the agency's administrative practice supports its position that we should remand to the Superintendent of Insurance. It claims that the Office of Adjudication failed to refer this case to the Insurance Administration by "oversight," and that the agency's ordinary procedure would have been so to refer it. The District appears to be unaware that the

transfer was actually made in the reverse direction after Mr. Atwater had filed in the forum which the District now says is the correct one.

■ In construing a statute, courts normally accord great deference to the interpretation of the agency charged with its administration, particularly if the interpretation is of long standing and has been consistently applied. *INS v. Cardoza Fonseca*, 480 U.S. 421, 445–46, 107 S.Ct. 1207, 1220–21, 94 L.Ed.2d 434 (1987); *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 522 n. 12, 102 S.Ct. 1912, 1918 n. 12, 72 L.Ed.2d 299 (1982). Less deference is appropriate where the interpretation lacks these attributes. *Cardoza Fonseca*, 480 U.S. at 446 n. 30, 107 S.Ct. at 1221 n. 30; *Stark v. Brannan*, 82 F.Supp. 614, 618 (D.D.C.1949), *aff'd*, 87 U.S. App.D.C. 388, 185 F.2d 871, *aff'd*, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1951); *Curran v. Office of Personnel Management Bureau*, 566 F.Supp. 1511, 1514 (D.D.C.1983), *aff'd*, 236 U.S. App.D.C. 351, 735 F.2d 617 (1984). We are not persuaded on this record that the alleged administrative practice presented to us in this case merits deference.

■ The District contends that the Council's "choice" of the Superintendent of Insurance to resolve complaints under the No–Fault Act "is particularly important here, where the insurance company's defense to the Atwater complaint is based on another statute under the superintendent's jurisdiction, D.C.Code § 35–1561, *which is not a consumer protection law*." (Emphasis added). Like Mr. Atwater, however, we are "at a loss to understand why a law protecting consumers from arbitrary cancellations of their insurance policies is not a consumer protection law." Indeed, the basic issue here is whether the case is governed by both of two consumer protection statutes or by only one.

The District also claims that "there is no warrant for reading the [CPPA] as allowing consumers to alter the Council's choice of expert administrator by the happen-

---

13. The No–Fault Act also provides that "the rights provided by this chapter shall be in addition to and shall not prejudice any other rights

the named insured may have at common law or otherwise." § 35–2109(k).

stance of where consumers file their administrative complaints." As we have noted above, however, there is no basis for accusing Mr. Atwater of forum-shopping, nor is he asking that Judge Nelson retain jurisdiction because of his choice of decision-maker. It was he who initially filed his petition with the Insurance Administration. It was the agency which transferred the case to the Office of Adjudication, presumably to avoid piecemeal litigation. Given this history, remanding the action now would have the effect of telling Mr. Atwater, four years after he filed the complaint in the office which the District now says is the right one, that because the case was assigned by the agency to be heard by one of its offices rather than by another, he must begin the process all over again. As Mr. Atwater justifiably remarks, "Franz Kafka could not imagine a more horrific bureaucratic scenario." Given the additional remedies available under the CPPA and the non-exclusivity of the remedies under the No–Fault Act, we agree with Mr. Atwater that Judge Nelson correctly retained jurisdiction.[14]

## IV

### THE MERITS

We now turn to the merits. The No–Fault Act requires insurers to provide thirty days notice to insured persons prior to cancelling a policy for failure to pay a premium. § 35–2109(b). Section 35–1561 provides[15] in pertinent part that where a premium finance company is authorized by power of attorney to cancel an insurance contract, it shall give 10 days notice to the insured of its intent to cancel. The principal substantive issue presented to us is whether, in a case involving a premium finance agreement such as the one in the present case, the 10–day notice requirement of § 35–1561 applies exclusively, or whether the 10–day notice must be provided in addition to the 30–day notice contemplated by § 35–2109(h). Although we must reach this question to dispose of Mr. Atwater's twelfth cause of action, *see* pp. 18–24, *infra*, we can resolve his eighth cause of action on narrower grounds.

### A. *The "should have known" issue*

■ In his eighth cause of action, Mr. Atwater claims in effect that by failing to give him 30 days notice of cancellation pursuant to § 35–2109(h), USAA violated the No–Fault Act, thus rendering the cancellation void. Judge Nelson ruled that Mr. Atwater would not be entitled to insurance coverage even if USAA failed to provide him with the notice required by statute. This decision was based on her finding that Mr. Atwater should have known that his insurance had been cancelled, whether or not he had received notification from the insurer:

> Furthermore, it appears that even if the cancellation had not been valid, i.e., no notice sent, D.C.Code Section 35–

---

**14.** The two claims against USAA are now all that remains in controversy. If the petition had contained only these two claims when it was initially filed, it probably would not have been transferred to the Office of Adjudication. For us to remand it now on that basis, however, would be procedurally unfair, and would also unduly limit the remedies available to Mr. Atwater.

**15.** Sub-sections (a) through (c) of § 35–1561 read as follows:

(a) When a premium finance agreement contains a power of attorney enabling the premium finance company to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be canceled by the premium finance company unless such cancellation is effectuated in accordance with this section.

(b) Not less than 10 days written notice shall be mailed to the insured of the intent of the premium finance company to cancel the insurance contract unless the default is cured within such 10–day period.

(c) After expiration of such 10–day period, the premium finance company may thereafter request, in the name of the insured, cancellation of such insurance contract or contracts by mailing to the insurer a notice of cancellation, and the insurance contract shall be canceled as if such notice of cancellation had been submitted by the insured himself, but without requiring the return of the insurance contract or contracts. The premium finance company shall also mail a notice of cancellation to the insured at his last known address.

2109(d) provides that "despite failure of the named insured to make timely payment of the renewal premium, failure by the insurer to provide the notice required by this section shall result in the insurer being required: (1) To provide coverage for any claim which would have been covered under the policy, if a claim arises within 45 days after the date *within which the named insured discovers or should have discovered that his or her policy has not been renewed;* and (2) To renew a policy upon the tender of payment: Provided, that the tender is made within 15 days after the date the named insured discovers, or should have discovered that his or her policy has not been renewed."

Since this was not the first vehicle insurance purchased by [Mr. Atwater], he was clearly aware that $115.00 did not cover insurance for more, at a maximum, than a few months. Furthermore, [Mr. Atwater] was aware that he had to make monthly payments on the insurance and to repay Metro Motors the financed $73.00 insurance down payment. [He] was aware that he had not made any payment since the initial down payment for the insurance. Thus, he should have realized that his policy was cancelled by at least the beginning of March, if not earlier. Pursuant to D.C.Code Section 35–2109(d) his insurance would have remained in effect forty-five days after that date. Thus, even under D.C.Code Section 35–2109(d), even if USAA and Mid Atlantic had failed to send the required notice, the policy would still be deemed cancelled for failure to make the appropriate payments.

(Emphasis in original). We agree with Judge Nelson's analysis.

As the court noted in *Johnson v. Cumis Ins. Soc., Inc.,* 624 F.Supp. 1170, 1173 (D.D.C.1986), the purpose of § 35–2109(b) is to give the insured adequate time to procure new coverage before coverage under an old policy lapses. Where, as here, the insured knew or should have known substantially before the accident that his coverage had lapsed for non-payment of premiums, the reason for voiding the cancellation does not apply.

**B. *The applicability of the thirty-day notice requirement.***

◼ In his twelfth cause of action, Mr. Atwater claims that USAA failed to comply with the provisions of § 35–2109(m), entitled "Consumer's right to information." This statute requires the insurer to provide a written copy of § 35–2109 to the insured at the time of initial purchase of insurance. Although this alleged violation is a somewhat technical one—it is not apparent to us how Mr. Atwater could have been damaged by it on the present set of facts—it is nevertheless our responsibility to resolve the issue. At least preventive relief may be available if the statute has been transgressed.

To resolve this question, we must squarely decide whether § 35–2109 applies in cases where the policy has been cancelled by a premium finance company rather than by the insurer. Judge Nelson held that

Complainant, having financed this transaction, interposed a finance company, pursuant to D.C. Code Section 35–1561, between himself and the insurer. Pursuant to the power of attorney signed on behalf of the Complainant, the notice of cancellation was required from the finance company and not the insurer.

Once again, we agree.

Although the result may not be the same under differently phrased statutes in other jurisdictions, District of Columbia law unequivocally provides that where a premium finance company has requested cancellation of the policy pursuant to a power of attorney for the insured, then *"the insurance contract shall be canceled as if such notice of cancellation had been submitted by the insured himself."* § 35–1561(c). The thirty-day notice provisions of § 35–2109(b) apply only in cases of "cancellation or refusal to renew *by an insurer"* of a policy of motor vehicle insurance. The insured would obviously not be entitled to notice of cancellation if he were the party cancelling the contract; one is not given notice of one's own actions. It therefore

follows from the unambiguous provisions of § 35–1561(c) that an insured is not entitled to notice from the insurer where the cancellation is requested by the finance company as his agent.

The foregoing conclusion, which we think inescapable in light of the language of § 35–1561(c), is reinforced by a consideration of the purposes and structure of the two statutes. When Congress enacted § 35–1561 to regulate insurance premium finance companies in the District of Columbia, it was reacting to perceived abuses within that industry. According to the Senate Report, "[u]pon default in an installment, policies have been cancelled without adequate notice of cancellation to the insured." Licensing and Regulation of Insurance Premium Finance Companies, S.REP. NO. 1098, 89th Cong., 2d Sess. 2 (April 4, 1966). Accordingly, Congress provided that "not less than ten days' written notice shall be mailed to the insured of the intent of the premium finance company to cancel the insurance contract unless the default is cured within such ten-day period." § 35–1561(b). After those ten days have expired, however, a premium finance company may "request, *in the name of the insured,* cancellation ... of [the] insurance contract." § 35–1561(c). Then, as we have noted, "the insurance contract shall be cancelled *as if such notice of cancellation had been submitted by the insured himself.*" *Id.* In conformity with this statutory declaration that the premium finance company is acting as an agent of the insured, there is no requirement that the insurer supply the insured with separate notice of cancellation. To the contrary, the statute mandates that the insurer give notice of cancellation to a number of interested third-parties. § 35–1561(d).

In contrast to § 35–1561, § 35–2109 by its terms applies only to cancellation of policies by insurers. This provision of the No–Fault Act derives from Regulation 71–13, which was passed by the District of Columbia Council in 1971 in an effort to curtail "arbitrary cancellation of insurance policies." As part of the Compulsory Motor Vehicle Insurance Act of 1981, now § 35–2109, the Council proceeded to "incorporate pertinent parts of Council Regulation No. 71–13 into statutory form and provide for extended protection provisions." Report of the Committee on Public Services and Consumer Affairs on Bill No. 4–140 at 10 (Feb. 16, 1982). In § 35–2109, as in its predecessor regulation, the Council limited an insurer's ability to cancel a policy without providing an insured with adequate notice. According to § 35–2109(b), "no cancellation ... by an insurer of a policy of motor vehicle insurance shall be effective" unless notice is given to the "named insured at least 30 days prior to the effective date of cancellation." The notice must include several features also mandated by the 1971 regulation: a statement of the specific reason for cancellation, § 35–2109(b)(1); a statement advising the insured of his right to appeal the cancellation, § 35–2109(b)(2); and a statement advising the insured of the possible availability of other insurance, § 35–2109(b)(3). In addition, the Act requires insurance companies to send the insured "a copy of the provisions of this section" when the insurance is first purchased. § 35–2109(m). This is the obligation at issue in Mr. Atwater's twelfth cause of action.

In support of his argument that the two statutes should be read together, and that he is entitled to the protections of both, Mr. Atwater relies heavily on the decision of the Supreme Court of Virginia in *American Interinsurance Exch. v. Lucy,* 222 Va. 530, 281 S.E.2d 895 (1981). In that case, the court required an insurer to provide statutory notice even though a premium finance company had purportedly cancelled the policy as an agent of the insured. Mr. Atwater concedes that these are decisions to the contrary,[16] but argues that

---

16. *See, e.g., Prudential Property & Casualty Ins. Co. v. Safeguard Mutual Ins. Co.,* 528 F.Supp. 709 (E.D.Pa.1981); *Tate v. Hamilton Ins. Co.,* 466 So.2d 1205 (Fla.Dist.Ct.App.1985); *Leader Nat'l Ins. Co. v. Gaydon,* 185 Ga.App. 322, 363 S.E.2d 859 (1987); *Northland Ins. Co. v. Walls,* 291 Md. 604, 436 A.2d 61 (1981); *but see Martin v. Ritcheson,* 306 So.2d 582 (Fla.Dist.Ct.App. 1975); *Cockern v. Government Employees Ins. Co.,* 415 So.2d 330 (La.Ct.App.1982). As the

All of the decisions against the insureds rest on a formalistic logic: that when an insured gives a power of attorney to a premium finance company in order to purchase insurance, a cancellation request by that company is the equivalent of a voluntary request by the insured. The Virginia Supreme Court recognized the underlying reality: insureds and premium finance companies are adverse parties, which explains why legislatures would give *greater* rather than *reduced* protection to consumers who need financing.

(Emphasis in original). Although this argument is appealing as a matter of abstract justice, we do not think that it can be reconciled with the plain language of our statute. It would be more appropriately addressed to the legislature.

The *Lucy* case merits further discussion for purposes of comparison. The facts of *Lucy* are similar to those of the case at bar. There, too, the insured (actually his executor) relied on a statute requiring an insurer, before cancelling a policy, to notify the insured of the reasons for cancellation, the availability of other insurance, and the right to appeal. There, too, the insurance was financed and cancelled by a premium finance company, and an insurer relied on a different section of the insurance law, which provided that the notice need not be given if the insured has notified the insurer that he wishes to cancel. Moreover, as in the case at bar, the insurance company argued that the premium finance company, holding a power of attorney from the insured, and acting as the insured's agent, could request cancellation on his behalf, making compliance with the notice provisions unnecessary.

The Supreme Court of Virginia disagreed with the insurer and held that the insured was entitled to the protection of the statute, and to notice from his insurer, even when his insurance was cancelled at the behest of a premium finance company. After analyzing the statute as a whole, the

court found that its notice provisions reflected a "legislative intent to provide specified safeguards to an insured when his insurance policy is terminated against his wishes." *Id.* at 896. The court concluded that "[t]he policy reasons for granting these rights are applicable whenever an insurance policy is being terminated involuntarily, whether by the insurance company at its own initiative or at the request of a premium finance company." *Id.* at 897.

The decision in *Lucy* depended in the final analysis on an implicit determination that the legislature intended cancellation of a policy by a premium finance company to be treated in the same fashion as an involuntary cancellation by an insurer. The court "perceived" such a legislative intention because one of the authorized reasons for involuntary cancellation pursuant to the statute was an insured's default under a premium finance plan. *Id.* at 897. As a result, the court concluded that the procedural protections of the statute were available to an insured even when his insurance was cancelled at the behest of his premium finance company. *Id.*

Unlike the Virginia statute at issue in *Lucy*, § 35–1561 and § 35–2109 evidence no legislative intent to treat cancellation by an insurer like cancellation by a premium finance company. To the contrary, § 35–1561(c) explicitly contemplates that cancellation by a premium finance company shall be treated "as if such notice of cancellation had been submitted by the insured himself." Although the statute also requires that an insurer give notice to interested third parties, § 35–1561(d), it requires no additional notice to an insured. Section 35–2109 was enacted after § 35–1561, but we can find nothing in it which would lead us to depart from the foregoing analysis. Rather, § 35–2109 by its own terms applies only to cancellation of an insurance policy by an insurer. Although the result in Virginia may arguably seem more equitable, and more in keeping with the reality of the relationship between an insured and his

---

contradictory results in Florida demonstrate, the results in these cases depend upon the particular statutes in force at the time. *See also*

Appleman, Insurance Law and Practice § 5012 n. 1 (1981).

premium finance company,[17] than the one compelled by the plain language of § 35–1561(c), we are not free as judges to rewrite a legislative enactment. Accordingly, Judge Nelson's decision must be and it is hereby

*Affirmed.*

---

**17.** An illustration of the potential inequities which may arise when a premium finance company is denominated an agent of a consumer, even though it may develop an adversarial relationship with its "principal," is reflected by the facts relating to the power of attorney in this case. Judge Nelson expressly found that Mr. Atwater never signed such an authorization, but concluded that he "cannot now argue that although he gave his tacit approval to such a power of attorney, that others relying on it (with no knowledge that the signature was not genuine) did so unreasonably." We agree. If Mr. Atwater had not authorized a power of attorney, he would not have received any insurance coverage at all. He cannot claim the benefits without the burdens.

Nevertheless, we find the manner in which this power of attorney was apparently secured less than edifying. If Mr. Atwater never signed it, we have no way of determining whether he knew what it meant. In such a scenario, the insured's "agent" may seem more like his opponent than like one who acts in the insured's behalf. We agree with Judge Nelson, however, that USAA has no responsibility for this situation, and no issue between the insured and the premium finance company is before us.