Betty Gene ALI, Plaintiff,

v.

MID–ATLANTIC SETTLEMENT
SERVICES, INC. et al.,
Defendants.

Civil Action No. 02–2271 (RWR).

United States District Court,
District of Columbia.

July 17, 2009.

Thomas C. Willcox, Washington, DC, for Plaintiff.

David E. Ralph, Holbrook, MD, Michael S. Steadman, Jr., Peter Frederick Axelrad, Council, Baradel, Kosmerl & Noland, P.A., Annapolis, MD, Pamela Anne Bresnahan, Elizabeth Treubert Simon, Vorys, Sater, Seymour and Pease LLP, Washington, DC, for Defendants.

### MEMORANDUM OPINION

RICHARD W. ROBERTS, District Judge.

Plaintiff Betty Gene Ali filed this lawsuit against multiple defendants alleging that she was the victim of a scheme to defraud her of the equity in property she owned in the District of Columbia. Defendants Richard Tolbert and Anthony Noble move for summary judgment. While initial developments in this litigation cast the defendants' conduct in a troubling light,[1] Ali does not show the existence of a genuine issue of material fact, and the defendants are entitled to summary judgment as a matter of law.

### BACKGROUND

Ali inherited a house located in Washington, D.C. following the death of her parents. (See Defendant Anthony Noble's Statement of Material Facts ("Noble's Stmt. of Facts") ¶ 1; Pl.'s Resp. to Noble's Stmt. of Material Facts ("Pl.'s Resp to Noble") ¶ 1.) Ali began trying to sell the house in 1999. She listed the property for $299,000, but was unsuccessful. A realtor suggested re-pricing the property at a price between $250,000 and $280,000. (Pl.'s Resp. to Tolbert's Stmt. of Undisp. Facts ("Pl.'s Resp. To Tolbert") ¶¶ 8–9.) In early 2000, Ali obtained a mortgage loan on the house for approximately $100,000. (Pl.'s Resp. to Noble ¶ 4.) By July 2000, she owed approximately $105,000 on her mortgage, and she was delinquent by approximately $11,000. Ali was facing foreclosure, and claims she was being harassed by people in the neighborhood. (Pl.'s Am. Compl. ("Am. Compl.") ¶ 13; Pl.'s Resp. to Noble ¶ 7.)

In July 2000, Ali attempted to refinance her mortgage through a company named EZ Mortgage. However, because Ali had refinanced the house within the previous six months, EZ Mortgage would not approve her second refinancing. (Pl.'s Resp. to Noble ¶¶ 9–10.)

While Ali was leaving EZ Mortgage's offices, she encountered Tolbert, a junior high school classmate of hers who was an advertising consultant for EZ Mortgage. (Pl.'s Resp. to Noble ¶ 11; Pl.'s Resp. to Tolbert ¶ 10.) Ali asked Tolbert whether he could convince EZ Mortgage to approve her request to refinance her loan. Tolbert responded that he was not able to do that. (Pl.'s Resp. to Noble ¶ 12.) She called him more than once asking if he wanted to buy the house. (Pl.'s Resp. to Tolbert ¶ 15.)

---

1. See, e.g., Ali v. Mid–Atlantic Settlement Services, 233 F.R.D. 32 (D.D.C.2006) (discussing willful evasion of service of process).

Later, Tolbert contacted Ali and informed her that Noble was willing to pay $150,000 to purchase the house. (Noble's Stmt. of Facts ¶ 15; Pl.'s Resp. to Noble ¶ 15.) Ali alleges that Tolbert knew that Ali "faced foreclosure and harassment ... and [was] aware she had limited education and knowledge of options such as renegotiating the loan with her lender," and thus "forced" Ali to accept Noble's $150,000 offer on the property. (Am. Compl. ¶ 16.)

On August 3, 2000, Ali entered into a contract to sell the property to Noble for $150,000. On the same date, Ali also signed an addendum to the contract binding her to pay six percent of the sales contract price to the purchaser to be applied to closing costs, and stating that "[b]oth parties realize property is facing foreclosure. Property is sold below market value to prevent foreclosure sale." (Pl.'s Resp. to Tolbert ¶ 17; Tolbert's Mem. in Support of Mot. for Summ. J. ("Tolbert's Mem.") Ex. 8 (Contract of Sale and Addendum); Noble's Mem. in Support of Mot. for Summ. J. ("Noble's Mem.") Ex. 3 at 2.) In return, Noble agreed to accept the property in "as is" condition. (Pl.'s Resp. to Tolbert ¶ 17.) On August 9, 2000, Noble paid $11,404.53 to Riggs Bank, in order to bring Ali's mortgage current on her house. (Pl.'s Resp. to Noble ¶ 18.)

On November 21, 2000, Ali appeared at the offices of Mid–Atlantic Settlement Services ("Mid–Atlantic") to close the sale of her house. The closing was conducted by Richard Perry, an employee of Mid–Atlantic, and Tolbert was also present. Noble was not present, and Ali claims to have never met Noble before then. (Pl.'s Resp. to Noble ¶¶ 23–24; Am. Compl. ¶¶ 20–23.) At the closing, Ali signed an HUD–1 settlement sheet that identified the seller as Ali, the purchaser as Noble, and a purchase price of $150,000. The HUD–1 also stated that Noble was paying Ali $199.22 for prepaid taxes, making a preliminary amount due to Ali of $150,199.22. (Am. Compl. ¶¶ 23–24; Compl. Ex. B (HUD–1) at 1.) The HUD–1 deducted from Ali's proceeds $300 for a water bill escrow, $105,725.14 for satisfaction of the existing mortgage, and $9,000 in expenses for "Sellers Paid Closing Costs." (HUD–1 at 1.)

According to the HUD–1, after all of the deductions were taken out of the sale proceeds, Ali was entitled to receive $35,174.08. (HUD–1 at 1–2.) Ali signed a document titled "Agreement," in which Ali acknowledged a credit due to Noble of $29,996.42 in previously paid installment payments and a debit charged against Ali of $1,500 in pre-paid rent for Ali staying in her house through the month of December, 2000, for a total offset of $31,496.42 against Ali's proceeds at closing. Ali was issued a check in the amount of $3,177.66. (Am. Compl. ¶¶ 31–32; Compl. Ex. D ("Agreement").) The Agreement, which was signed by Ali and notarized, reads:

> I, Betty G. Ali, hereby acknowledge that I have received a total sum of $29,996.42 from Anthony Noble for the real property located at 1010 G Street, S.E., Washington, D.C. All monies advanced through November 21, 2000, will be reimbursed to Mr. Noble at closing. Pre pay [sic] rent in the amount of $1,500.00 good thru [sic] January 2nd. Grand total of $31,496.42.

Ali alleges that she was induced to sign the Agreement because Tolbert told her that the difference between the $35,174.08 due to her under the HUD–1 and the $3,177.66 paid to her at the closing would be paid to her within three days of the closing.[2] (Am. Compl. ¶ 35.) Tolbert not

---

2. Ali does not allege that Tolbert's alleged promise induced her to sell her house, though.

only denies making any such representation (*see* Tolbert's Stmt. of Facts ¶ 23), but Tolbert and Noble allege that the money Ali was paid at closing was all she was entitled to receive in light of the offsets mentioned above against Ali's proceeds due under the HUD–1.[3] (Tolbert's Stmt. of Facts ¶¶ 24–25, Tolbert's Mem. at 9; Noble's Mem. at 4–5.)[4]

The amended complaint alleges six counts against Tolbert and Noble: violations of the D.C. Consumer Protection Procedures Act ("DCCPPA"), D.C.Code § 28–3904, against Tolbert for brokering the sale of Ali's house (Count I); common law fraud against Tolbert (Count II); civil conspiracy to defraud Ali against Tolbert and Noble (Count III); aiding and abetting fraud against Tolbert and Noble (Count IV); negligence against Tolbert and Noble (Count VII); and equitable rescission of the agreement against Noble (Count IX).

Noble and Tolbert have moved for summary judgment. Ali opposes, arguing that there are genuine issues of material fact that preclude summary judgment.

### DISCUSSION

"Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C.Cir.2009) (citing Fed.R.Civ.P. 56(c) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue of fact is found where the evidence is "such that a

reasonable jury could return a verdict for the nonmoving party," after "resolving ambiguities and drawing all factual inferences in favor of the nonmoving party." *Moore*, 571 F.3d at 66 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). "The nonmoving party cannot defeat summary judgment by 'simply show[ing] that there is some metaphysical doubt as to the material facts.'" *Moore*, 571 F.3d at 66 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Not all alleged factual disputes represent genuine issues of material fact which may only be resolved by a jury. Material facts are those that might affect the outcome of the suit under governing law, and a genuine dispute about material facts exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Nails v. England*, 311 F.Supp.2d 116, 121 (D.D.C.2004) (internal quotations omitted).

In deciding whether the plaintiff has shown a genuine issue of material fact, a court should accept as true statements proffered by the non-movant, other than conclusory allegations or assertions that lack factual support in the record. *Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C.Cir.2006) (citing *Dist. Intown Prop. L.P. v. District of Columbia*, 198 F.3d 874, 878 (D.C.Cir.1999)). To successfully oppose a motion for summary judgment under Rule 56(c), a non-moving party must present sufficient admissible evidence for a reasonable trier of fact to find for the nonmoving party. *Juergens v. Urban Title Servs.*, 533 F.Supp.2d 64, 73 (D.D.C. 2008) (citing *Laningham v. U.S. Navy*, 813

---

3. Those sums fall $500 short of the $35,174.08 figure. It is unclear whether the $500 deposit Noble paid accounts for the difference. (*See* HUD–1, line 201.)

4. Ali has taken inconsistent positions on this issue. In her amended complaint she claims

to have not received any of the $31,496.42 mentioned in the Agreement. (*See* Am. Compl. ¶ 36.) However, later she acknowledged receiving at least $27,504.53 as partial payments from Noble. (*See* Pl.'s Response to Noble ¶¶ 20–21.)

F.2d 1236, 1242–43 (D.C.Cir.1987)). Briefs containing mere allegations or merely denying the movant's pleading are not enough to prevent summary judgment; instead, a non-movant must go beyond the pleadings to proffer specific facts rebutting the movant's assertions. *See Greer v. Paulson,* 505 F.3d 1306, 1315 (D.C.Cir. 2007); *Burke v. Gould,* 286 F.3d 513, 517–18 (D.C.Cir.2002). "Although the burden on the nonmoving party is not great, it is still required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." *Palestine Info. Office v. Shultz,* 853 F.2d 932, 944 (D.C.Cir.1988).

## I. CONSUMER PROTECTION PROCEDURES ACT CLAIM AGAINST TOLBERT

■ The amended complaint asserts that Tolbert violated the DCCPPA by having Ali "agree to sell 1010 G Street on unconscionable terms ... with full knowledge of [Ali's] inability to negotiate a fair price for the sale of her property," contrary to DCCPPA, D.C.Code § 28–3904(r), which reads, in relevant part:

It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to

\* \* \*

(r) make or enforce unconscionable terms or provisions of sales or leases; in applying this subsection, consideration shall be given to the following, and other factors:

\* \* \*

(2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;

(3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees;

\* \* \*

(5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors[.]

D.C.Code § 28–3904(r). The amended complaint alleges that Tolbert violated the DCCPPA through the "act of brokering the sale of 101 G Street from [Ali] to [Noble]," which Ali alleges constituted a trade practice by a merchant that is regulated by the DCCPPA. (Am. Compl. ¶ 44.)

Tolbert asserts that he was not a commercial participant in the sale of Ali's house, which makes the DCCPPA not applicable to his actions. "The Consumer Protection Procedures Act is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." *Snowder v. Dist. of Columbia,* 949 A.2d 590, 598 (D.C.2008) (quoting *Atwater v. Dist. of Columbia Department of Consumer & Regulatory Affairs,* 566 A.2d 462, 465 (D.C.1989)). The DCCPPA creates a cause of action for consumers to attempt to redress unlawful trade practices. *Id.* Under D.C.Code § 28–3905(k)(1), "a person, whether acting for the interests of itself, its members or the general public, may bring an action under this chapter ... seeking relief from the use by any person of a *trade practice* in violation of a law of the District of Columbia" (emphasis added). Courts have held that the DCCPPA "was designed to police trade practices

arising only out of consumer-merchant relationships." *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C.1981); *see also DeBerry v. First Gov't Mortgage & Investors Corp.*, 743 A.2d 699, 701 (D.C. 1999) (determining that an unlawful trade practice can be committed only by a "merchant"); *Snowder*, 949 A.2d at 599–600 (holding that the DCCPPA did not apply because the District of Columbia was not a "merchant" with respect to towing and storage services in part because it did not "receive any remuneration . . . for the towing and storage services provided[.]"); *Kopff v. Battaglia*, 425 F.Supp.2d 76, 93 (D.D.C.2006) (holding that plaintiff consumers could not bring a claim under the DCCPPA based upon the defendant's purported facilitation of unwanted facsimile transmissions because there was no consumer-merchant relationship, and therefore defendant's actions were not actionable trade practices under the DCCPPA).

Tolbert argues that because he did not receive payment for his role in the contract of sale, he was not a broker and thus did not make or enforce any of the purportedly unconscionable terms in the contract, and that his behavior fell outside of the purview of the DCCPPA because it was not a trade practice. Ali attempts to show that there is a genuine issue of material fact as to whether Tolbert was compensated for some form of trade practice with respect to the sale of Ali's house by alleging that Tolbert acquired an equitable interest in Ali's house by paying the outstanding balance of Ali's mortgage. (Pl.'s Resp. to Tolbert's Mot. for Summ. J. at 10–11.) However, Tolbert merely acknowledged forwarding monies provided to him by Noble to make that payment, and Ali provides no evidence that Tolbert ob-

tained or materially benefitted from or took any steps to memorialize or protect any purported equitable interest in the property. Moreover, Tolbert had told Ali that he was going to "buy [Ali's house] for [his] son," and there is no evidence supporting Ali's argument (*see* Pl.'s Resp. to Tolbert's Mot. for Summ. J. at 8, 11–13) that Tolbert held himself out as a mortgage broker or credit protection merchant. (*See* Tolbert's Mem. Ex. 2 ("Ali Dep.") at 110–11; Pl.'s Response to Tolbert ¶ 23 (Ali's admission that "Tolbert made no representations and provided no instructions of any kind to Ali at the November 11, 2000 settlement regarding any aspect of that closing.").) Ali's argument lacks evidentiary support in the record, and the pleadings and the evidence demonstrate there is no genuine issue of material fact as to whether Tolbert was a merchant under the DCCPPA. Because Tolbert was not a merchant, his actions regarding the sale of Ali's house were not regulated by the DCCPPA, and judgment will be entered for Tolbert on Count I.[5]

## II. COMMON LAW FRAUD AGAINST TOLBERT

■■■ Count II asserts that Tolbert "knowingly misrepresented to [Ali] that she would be paid the Unpaid Funds within three days after the Closing, to induce her to sign the Fraudulent Acknowledgment. [Ali] signed the Fraudulent Acknowledgment in reliance on [Tolbert's] misrepresentations." (Am. Compl. ¶¶ 51–53.) The essential elements of common law fraud in the District of Columbia are: "(1) a false representation, (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive,

5. Tolbert also argued that even if his actions constituted trade practices that are regulated by the DCCPPA, Ali was not "without meaningful choice" as to whether to enter the contract of sale, an element that Ali would have to show to demonstrate that the contract was unconscionable. This issue need not be reached.

and (5) action is taken in reliance upon the representation." *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1074 n. 22 (D.C.2008) (quoting *Bennett v. Kiggins*, 377 A.2d 57, 59–60 (D.C. 1977)). "In order to state a claim for common law fraud, the plaintiff must allege that the fraud caused [her] damage." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 793 (D.C.Cir.1983). "It is elementary that speculative damage will not support an action for common law fraud." *Id.* at 793 n. 22 (citations and internal quotation marks omitted). "To be entitled to a trial on the merits of a fraud claim, a plaintiff must allege 'such facts as will reveal the existence of all the requisite elements of fraud. Allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient.'" *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C.1992) (quoting *Bennett*, 377 A.2d at 59–60).

■ Ali's fraud claim is fatally flawed as she has failed to present evidence that Tolbert made a false representation that Ali relied upon to her detriment. Tolbert insists he made Ali no promise at the closing of future payment. Ali now admits as much. (*See* Pl.'s Resp. to Tolbert ¶ 23.) With no misrepresentation, there is no fraud. Nor has Ali shown the damage she alleged. The amended complaint alleges that contrary to the Agreement's representation that Ali received $29,996.42 from Tolbert before the closing, Ali never received any funds prior to closing from Noble. (Am. Compl. ¶ 33.) The undisputed fact is that the amended complaint is flat wrong, and that Ali did receive a substantial amount of money from Noble be-fore the closing. Ali admits it. (*See* Pl.'s Resp. to Tolbert's Mot. for Summ. J., ¶¶ 3–4; Pl.'s Response to Noble's Stmt. of Mat. Facts, ¶¶ 20–21.) While the parties may differ by $2,491.81 about exactly how much Ali did receive, Ali neither argues nor supports with precedent that this is material and suffices to revive the flatly false factual allegation of fraud in the complaint that Noble never paid Ali any money before the closing. Ali has not brought a contract claim to recover unpaid amounts; her claim is a tort claim of a knowing and material misrepresentation upon which plaintiff relied to her detriment, and the facts show that claim to be wrong.[6] In any event, a party should not be allowed to use her own contradictory assertions to create a genuine issue of material fact. *See Pyramid Secur., Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C.Cir.1991); *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C.Cir.2007).

■ Ali also argues that there is a genuine issue of material fact as to whether Tolbert committed fraud by failing to disclose in writing that he was not acting as an agent of EZ Mortgage and that his actions were not in Ali's best interest. Nondisclosure of a material fact, or silence, as well as active misrepresentation, may constitute fraud. *Bennett*, 377 A.2d at 59. "The concealment of a fact that should have been disclosed is also a misrepresentation." *Sage v. Broad. Publ'n Inc.*, 997 F.Supp. 49, 52 (D.D.C.1998). However, "mere silence does not constitute fraud unless there is a duty to speak." *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C.1948). A duty to speak can arise either from a fiduciary relationship, *see*

---

6. Moreover, Ali has not even established what damages, if any, she would be entitled to based upon the now-disproven false promise by Tolbert. For example, Ali does not point to any evidence showing that absent Tolbert's purported representation regarding the alleged $2,491.81 in unpaid funds, she would not have sold her house, as opposed to not having signed the Agreement.

*Hogan v. Md. State Dental Ass'n,* 155 Md.App. 556, 843 A.2d 902, 908 (Md.2004), or from an instance where a material fact or defect is unobservable or undiscoverable by "an ordinarily prudent person upon reasonable inspection." *Loughlin v. United States,* 230 F.Supp.2d 26, 50 (D.D.C. 2002).

Ali fails to show that Tolbert's failure to assert in writing that he was not acting on behalf of EZ Mortgage and that his actions were not in Ali's best interests caused her any damage. Nor does Ali present any authority supporting the notion that Tolbert was required to inform her that he was not acting as an agent of EZ mortgage *in writing.* Thus, summary judgment will be granted to Tolbert on Count II.

## III. CIVIL CONSPIRACY TO DEFRAUD; AIDING AND ABETTING

■ Count III asserts that Noble and Tolbert "agreed to defraud" Ali by preparing a "false" HUD–1, which "deceived [Ali] into believing she would receive the Promised Funds when in fact she was never paid that amount, and [Tolbert] falsely represented that Ms. Ali would receive the Unpaid Funds after closing." (Am. Compl. ¶¶ 66–70.) Count IV asserts a claim against both Tolbert and Noble for "aiding and abetting the deception of" Ali. (Am. Compl. ¶¶ 71–75.)

■ Tolbert and Noble argue that they are entitled to summary judgment on Counts III and IV because Ali failed to prove the underlying fraud alleged in Count II, and that the civil tort claims of conspiracy to commit fraud and aiding and abetting are derivative claims dependent upon some underlying tort. In order to prove civil conspiracy, a plaintiff must show " '(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful

manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.' " *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724, 738 (D.C.2000) (citing *Griva v. Davison,* 637 A.2d 830, 848 (D.C.1994)); *see also Brady v. Livingood,* 360 F.Supp.2d 94, 104 (D.D.C.2004). In the District of Columbia, "there is no recognized independent tort action for civil conspiracy ...." *Executive Sandwich Shoppe, Inc.,* 749 A.2d at 738 (citing *Waldon v. Covington,* 415 A.2d 1070, 1074 n. 14 (D.C.1980)). Rather, "it is a means for establishing vicarious liability for the underlying tort.' " *Id.* (citing *Halberstam v. Welch,* 705 F.2d 472, 479 (D.C.Cir.1983)). As a result, "civil conspiracy depends on performance of some underlying tortious act." *Id.* (citing *Halberstam,* 705 F.2d at 479). Similarly, civil liability for aiding and abetting requires "proof of (1) a wrongful act causing an injury by a party aided by the defendant; (2) the defendant's knowledge of his role as part of an overall illegal or tortious activity at the time that he provided assistance; and (3) the defendant's knowing and substantial assistance in the principal violation." *Ungar v. Islamic Republic of Iran,* 211 F.Supp.2d 91, 99 (D.D.C.2002).

Ali must show some underlying fraud for these counts to survive the motions for summary judgment. Ali does not present a genuine issue of material fact that Tolbert and Noble committed fraud, and Ali does not specify in her amended complaint or in her subsequent filings any other underlying act that would form the basis of these derivative claims. Therefore, the motions for summary judgment on Counts III and IV of Ali's amended complaint will be granted.

## IV. NEGLIGENCE

■ Count VII asserts that Noble and Tolbert owed a duty to Ali to conduct the

closing and consummate the transaction in a manner that was reasonable and did not violate federal or state laws. Count VII alleges that each defendant breached this duty to Ali by "permitting violations of federal and state laws" that Ali does not identify.[7] (Am. Compl. ¶¶ 91–96.)

"Under District of Columbia law, a plaintiff asserting a claim of negligence must establish that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached its duty; and (3) the breach was the proximate cause of (4) damages sustained by the plaintiff." *Jolevare v. Alpha Kappa Alpha Sorority, Inc.,* 521 F.Supp.2d 1, 14 (D.D.C.2007) (citing *Dist. of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984), and *Trifax Corp. v. Dist. of Columbia,* 53 F.Supp.2d 20, 29 (D.D.C. 1999)). "The foundation of modern negligence law is the existence of a duty owed by the defendant to the plaintiff. Negligence is a breach of duty; if there is no duty, there can be no breach, and hence no negligence." *Jolevare,* 521 F.Supp.2d at 15 (quoting *N.O.L. v. Dist. of Columbia,* 674 A.2d 498, 499 n. 2 (D.C.1995)). "The existence of a legal duty being an essential element of a negligence claim under District of Columbia law, the plaintiffs 'must specify a negligent act and characterize the duty whose breach might have resulted in negligence liability.'" *Jolevare,* 521

F.Supp.2d at 15 (quoting *Dist. of Columbia v. White,* 442 A.2d 159, 162 (D.C.1982)).

Ali fails to establish any specific basis upon which Noble, as the purchaser of her house, or Tolbert, as an attendee at the closing, owed any duty toward her.[8] Ali alleges that Tolbert had a fiduciary duty toward her because he was selling "credit protection," and that he breached that duty by failing to inform Ali that she "would only have $3,000 left over" after the sale of her house. (Pl.'s Resp. to Tolbert's Mot. for Summ. J. at 15.) However, there is nothing in the record showing that Tolbert held himself out as selling credit protection, that he conducted the closing, or that he assumed some role that would lead him to have a fiduciary duty to Ali at the closing. In the face of the fact that Ali signed the Agreement, which spelled out how she would receive compensation for her house, Ali presents nothing more than a conclusory allegation that Tolbert owed her a duty to explain that she would only have a specific sum of money left over. A plaintiff alleging negligence may not rest on conclusory assertions regarding the existence of the element of duty. *Jolevare,* 521 F.Supp.2d at 15 (finding that the plaintiffs failed to establish that the defendant sorority breached a duty owed to the plaintiffs where the plain-

---

7. Ali fails to analyze what law governs her negligence claim, instead stating the elements of a claim of negligence "under District of Columbia or Maryland law[.]" (Am. Compl. ¶ 92.) Tolbert and Noble assert that District of Columbia law governs Ali's negligence claim, and Ali does not dispute that proposition in her reply briefs. Ali may be deemed to have conceded the defendants' argument. *Jacobsen v. Oliver,* 555 F.Supp.2d 72, 77 (D.D.C. 2008) (citing *CSX Transp., Inc. v. Commercial Union Ins. Co.,* 82 F.3d 478, 482–83 (D.C.Cir. 1996)).

8. In fact, Ali does not appear to oppose Noble's motion for summary judgment with re-

spect to the negligence claim to the extent that it applies to him, because Ali completely fails to address Noble's argument for summary judgment on this claim in her opposition to Noble's motion for summary judgment. Further, Ali's citation to authority purporting to establish that Tolbert owed her a fiduciary duty quotes language that appears nowhere in the case cited, and would not support the existence of a fiduciary duty even if the citation were proper. (*See* Pl.'s Resp. to Tolbert's Mot. for Summ. J. at 15) (errantly citing *Columbia Plaza Corp. v. Security National Bank,* 676 F.2d 780, 789 (D.C.Cir. 1982).)

tiffs made conclusory allegations that the defendants owed them a duty to abide by their own policies and procedures); *see also Trifax Corp.*, 53 F.Supp.2d at 29–30 (finding that the plaintiffs could not demonstrate that the District of Columbia's Office of the Inspector General owed them a duty to follow generally accepted government audit standards). Ali's conclusory allegations are insufficient to establish a genuine issue of material fact, and judgment will be entered for the defendants on Count VII.

## V. EQUITABLE RESCISSION

Count IX asserts a claim against Noble, alleging that the sale of Ali's house should be equitably rescinded because of Tolbert's alleged fraudulent misrepresentation that he would pay her the unpaid funds within three days of the closing.[9] (Am. Compl. ¶¶ 108–114.)

█ Rescission is not an independent cause of action, but instead is an equitable remedy that a plaintiff who has been induced to enter in a contract by false and fraudulent misrepresentations may elect as an alternative to damages. *See Brown v. National Permanent Fed. Sav. and Loan Ass'n*, 683 F.2d 444, 447 (D.C.Cir.1982); *Simmons v. Brooks*, 66 A.2d 517, 518 (D.C. 1949). Since summary judgment will be entered against Ali regarding her claim of fraud, summary judgment will be granted against her on Count IX.

## CONCLUSION

Because Ali cannot show the existence of a genuine issue of material fact regarding her claims against Tolbert and Noble, and these defendants are entitled to judgment

as a matter of law, their motions will be granted. An appropriate order accompanies this Memorandum Opinion.

---

**9.** In addition, Ali appears to state a claim of "unconscionability" under the common law of the District of Columbia and D.C.Code § 28:2–302. However, unconscionability applies only defensively to preclude the enforcement of a contract, not as a sword that a party may use to rescind an unfavorable contract. *See Johnson v. Long Beach Mortgage Trust*, 451 F.Supp.2d 16, 36 (D.D.C.2006).