Joseph SCHIFF, Appellant,

v.

AMERICAN ASSOCIATION OF RETIRED PERSONS, Appellee.

No. 95–CV–1141.

District of Columbia Court of Appeals.

Argued Oct. 9, 1996.

Decided May 29, 1997.

Geoffrey P. Gitner, with whom M. Roy Goldberg, Martha Leary Sotelo, Washington, DC, Herbert Beigel, New York City, and Ronald A. Schy, Chicago, IL, were on the brief, for appellant.

Rodney F. Page, with whom Jeanine M. Worden, Washington, DC, was on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and KING, Associate Judges.

KING, Associate Judge:

In this case we have been asked to decide the circumstances, if any, under which a private party can sue a nonprofit organization, incorporated in the District of Columbia and certified under D.C.Code § 29-533,[1] pursuant to the Consumer Protection and Procedures Act ("CPPA"), D.C.Code §§ 28-3901 *et seq.* (1996 Repl.), for alleged unlawful trade practices. We have also been asked to decide whether a claim of fraud lies where a nonprofit corporation receives income in excess of administrative costs for the income-producing activity, and whether a claim for unjust enrichment can be maintained between two parties to an express contract. We hold that AARP, as a nonprofit corporation, cannot be sued pursuant to the CPPA. We also conclude that fraud or misrepresentation was not sufficiently alleged in the complaint, and that there can be no claim for unjust enrichment when an express contract exists between the parties.[2]

The American Association for Retired Persons ("AARP") is a nonprofit corporation in the District of Columbia, holding a certificate of incorporation pursuant to section 29-533. AARP has thirty two million members over

---

1. Upon the issuance of the certificate of incorporation, the corporate existence shall begin, and such certificate of incorporation shall be conclusive evidence that all conditions precedent required to be performed by the incorporators have been complied with and that the corporation has been incorporated under this chapter, except as against the District of Columbia in a proceeding to cancel or revoke the certificate of incorporation.
D.C.Code § 29-533 (1996 Repl.).

2. Appellant contends that it was error for the trial court to dismiss his unjust enrichment claim because "the existence of any express contracts has not been alleged" in his complaint. The trial judge, however, correctly ruled that the existence of two express contracts between Schiff and AARP can be determined from the allegations in the complaint. The first is for Schiff's AARP membership, and the second is for Schiff's health insurance contract that he purchased through AARP. Therefore, there can be no claim of unjust enrichment. *See Bloomgarden v. Coyer,* 156 U.S.App. D.C. 109, 118, 479 F.2d 201, 210 (1973) (in order to claim a remedy for unjust enrichment, there must be *no* contract, either express or implied).

age fifty and "offers numerous services and products to its members that are designed for elderly and retired persons." These "services and products" include credit cards, health and home insurance, travel services and products, investment services, and educational services.

Appellant Dr. Joseph H. Schiff is a member of AARP and has been for the past twenty years. Schiff purchased supplemental Medicare[3] and long-term-care insurance plans from AARP after AARP provided Schiff with information on its respective insurance programs. Schiff alleges that AARP informed him: 1) that the long-term-care plan was underwritten by the Prudential Insurance Company of America ("Prudential"); 2) that AARP is a nonprofit membership organization; 3) that the AARP Insurance Trust entered into a group insurance contract with Prudential on behalf of the AARP membership; and 4) that investment income from deposits in the Trust account and an "allowance" of three percent on insurance payments collected by the Trust were remitted to AARP to use for the "general purposes of AARP and its members."

Schiff contends that AARP's "allowance" from the Trust constitutes a commission on the sale of the Prudential insurance products sold to AARP members under the AARP name. Schiff has alleged that in 1993 AARP earned $85 million in allowance fees, and another $18 million in interest on insurance premiums it collected from its members before the premiums were paid to Prudential. Schiff contends that the earnings from the allowance fee, less $17 million in overhead costs, went to "pay AARP officers and directors extraordinary salaries or other benefits"; *i.e.*, that this income constitutes "profit" for the "non" profit AARP. Thus, Schiff claims that AARP "misrepresented" to its members: 1) that it is a "non" profit corporation when in fact it is a "for" profit corporation; 2) that a stock investment program offered by AARP to its members and promoted by AARP as a program "designed for AARP members" was not so designed; 3) that AARP Financial Services, a wholly owned taxable subsidiary of AARP, retained a portion of the management fees on the stock investment program, which fees AARP failed to disclose to its members; and 4) that AARP failed to disclose to its members a $135 million tax settlement with the Internal Revenue Service ("IRS") for taxable income for tax years 1985–1993, which failure constituted a "material misrepresentation."[4]

Schiff commenced a class-action suit against AARP alleging that it had "violated the [CPPA], committed common law fraud and was unjustly enriched by selling goods and services to its members without disclosing that it was profiting from these sales."[5] The trial court granted AARP's motion to dismiss, filed pursuant to Super. Ct. Civ. R. 12(b)(6),[6] ruling: 1) that the CPPA does not apply because AARP is a nonprofit corporation; 2) that there was "no misrepresentation" by AARP to its members regarding its nonprofit status, and that, pursuant to section 29–533, a complaint of this sort could only be brought by the District government; 3) that Schiff did not identify an existing

---

3. Schiff subsequently cancelled his AARP Medicare insurance.

4. AARP concedes the amount of the settlement with the IRS, while contending that the settlement "did not involve any admission of tax liability by AARP." AARP also states that evidence provided to the trial court in a sealed record established that AARP disclosed to its members information regarding the revenues received "from the insurance and other programs ... and its settlement with the IRS."

5. AARP moved to dismiss Schiff's complaint on February 22, 1995. On April 5, 1995, the trial court granted the parties' joint motion for an extension of time to certify the class, extending the period to an additional thirty days after the court's ruling on AARP's motion to dismiss. The trial court never ruled on the request for class certification because on May 2, 1995, it granted AARP's motion to dismiss.

6. * * *

(b) *How presented.* Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or 3rd-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:

* * * * * *

(6) failure to state a claim upon which relief can be granted.

Super. Ct. Civ. R. 12(b)(6) (1996).

duty obliging AARP to disclose to its members that some of its activities generates a significant amount of income; and 4) that there could be no unjust enrichment claim because Schiff entered into a written contract for his AARP membership and for the AARP health insurance products he purchased. After the denial of a timely motion for reconsideration, this appeal followed. We affirm.[7]

## I. Standard of Review

When reviewing a dismissal under Super. Ct. Civ. R. 12(b)(6), we apply the same standard used by the trial court and construe the complaint in a light most favorable to the plaintiff, while assuming the facts alleged in the complaint as true. Dismissal is proper only where it appears, beyond doubt, that the plaintiff can prove no facts which would support the claim. *Cauman v. George Washington Univ.*, 630 A.2d 1104, 1105 (D.C.1993); *Aronoff v. Lenkin Co.*, 618 A.2d 669, 684 (D.C.1992). Dismissal was proper here because, accepting Schiff's allegations as true, we are satisfied that AARP's activities are not governed by the CPPA because of its nonprofit status, and there is no basis for concluding either that AARP committed common law fraud, or that AARP was unjustly enriched from its dealings with Schiff.

## II. CPPA

 The trial court held that Schiff's complaint was barred by this court's holding in *Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory School, Inc.*, 514 A.2d 1152 (D.C.1986), ruling that there was nothing in any of the cases cited by Schiff to support the proposition that "the sale of certain goods and services to members of a membership organization like AARP was intended to subject such organizations to the CPPA even if a significant amount of dollars is generated by such sales." Schiff contends that the holding in *Save Immaculata/Dunblane* is limited to nonprofit educational institutions and does not apply to other nonprofit entities such as AARP. We see no basis for such a restrictive interpretation of that case.

Our opinion in *Save Immaculata/Dunblane* stemmed from the decision of a private girls' school to cease its operation. A group of alumnae, students and parents bought an action seeking both an order barring the closing and damages on several theories, including a claim under the CPPA. The trial court granted summary judgment for the school and we affirmed, holding that the school, because it was a nonprofit educational institution, was not included within the coverage of the CPPA. There was nothing in our opinion, however, limiting the holding to educational institutions as such, or to activities involving the provision of educational services to students in return for a fee. Indeed, the only case relied upon by the *Save Immaculata/Dunblane* court suggests there should be no such limitations. *See Board of Regents of the Univ. of Wis. v. Mussallem*, 94 Wis.2d 657, 289 N.W.2d 801, 807 (1980).

In *Mussallem*, a student, who had defaulted on a loan from the University of Wisconsin, defended against the school's effort to collect after a default on the loan by citing a provision of the state's consumer act, which is similar to the District's CPPA. The court began its analysis by recognizing that if the loan had been obtained from a private financial institution such as a bank, the credit act would have applied. *Id.* at 807. The act did not apply to loans given by the university, however, because the university was not a private commercial business and because "its purpose is not one of earning a profit, but rather it is motivated by a public, non-profit purpose . . . ." Indisputably, the university was an educational institution, but the court's analysis did not turn on that fact. The transaction in dispute—a loan—was the kind of transaction ordinarily regulated by the state's consumer act if conducted by a private commercial business. But the loan transaction in question was not subject to the consumer act because the university was maintained for a nonprofit purpose. The same is true with AARP's role as an agent between its members and Prudential. The sale of insurance would ordinarily be covered

---

7. Because Schiff has purchased only AARP health insurance products, we conclude that he has no standing to raise any claims concerning the AARP stock investment program and the fees that AARP retains from that program.

by the CPPA, but because AARP is maintained as a nonprofit organization, the act does not apply to it. *See also Barry by Ross v. New Jersey State Highway Auth.*, 245 N.J.Super. 302, 585 A.2d 420, 424 (Super.Ch.1990) (public highway authority not included within state's consumer act).

We find further support for this view in *Kozup v. Georgetown Univ.*, 663 F.Supp. 1048 (D.D.C.1987), *vacated on other grounds*, 271 U.S.App. D.C. 182, 851 F.2d 437 (1988) (inapplicability of CPPA affirmed). *Kozup* relied on *Save Immaculata's* holding that a nonprofit educational institution, by virtue of its nonprofit status, is not a "merchant" within the meaning of section 28–3901. *Kozup* also rejected plaintiff's contention that Georgetown Hospital and its provider of blood products, the nonprofit American Red Cross ("ARC"), were "merchants" even though ARC sold blood products to Georgetown Hospital, the costs of which the hospital passed on to its patients. The *Kozup* court observed:

> That the ARC assesses charges for the provision of blood is not determinative of its identity as a "merchant" under the [CPPA]
>
> .... Many if not all non-profit entities are organized and run with traditional principles of sound business management ... not to turn a profit, but to survive and continue to perform whatever functions they were founded to perform.

*Id.* 663 F.Supp. at 1060–61. Similarly, the fact that nonprofit AARP accepted fees for arranging the sale of insurance to its members by Prudential did not make it subject to the CPPA.

Finally, as AARP observes, the *Save Immaculata/Dunblane* decision exempting nonprofit organizations from CPPA coverage was decided over ten years ago, and during that time the Council of the District of Co-

lumbia ("Council") has taken no steps to amend the provision of the CPPA to include activities of nonprofits within its coverage. We recognize that undue weight should not be given to the Council's silence on the subject.[8] However, since *Save Immaculata/Dunblane* was· decided, the CPPA has been amended four times[9] without any changes being made in the act's coverage of nonprofits. Significantly, one of those amendments was adopted with the express purpose of reversing the holding in a case decided by this court.[10] *See Winters v. Ridley*, 596 A.2d 569, 576 (D.C.1991) (Schwelb, J., concurring) (because Council acted to reject one interpretation of a statute, its silence suggests absence of dissatisfaction with another interpretation of same statute). The Council is free, of course, to extend the coverage of the CPPA to certain activities of nonprofit organizations if it wishes to. However, because there is no indication that the Council intended that nonprofits be included, and in light of the holding of *Save Immaculata/Dunblane* and *Kozup*, and the absence of any disapproval of those cases by the Council, we are unwilling to extend such coverage ourselves. Accordingly, we hold, as a matter of law, that Schiff's claim against AARP fails because AARP is a nonprofit organization.

### III. Common Law Fraud

■ Schiff also alleged that AARP committed fraud by representing that the "allowance" it received from Prudential, pursuant to AARP's group insurance contract with Prudential, went to cover AARP's costs to administer the insurance program, when in fact these monies constituted a "commission, royalty, fee, or unrelated business income paid to or earned by AARP." Schiff asserts that this income is "not used for the general purposes of AARP and its members, [but

---

8. *See Blagden Alley Ass'n v. Zoning Comm'n*, 590 A.2d 139, 143 (D.C.App.1991).

9. District of Columbia Consumer Protection Act Amendments Act of 1990, D.C. Law 8–234, 38 D.C.Reg. 296 & D.C. Law 8–236, 38 D.C.Reg. 306; Technical Amendments Act of 1993, D.C. Law 10–68, 40 D.C.Reg. 6311; Technical Amendments Act of 1995, D.C. Law 11–30, 42

D.C.Reg. 1547; Omnibus Budget Support Act of 1995, D.C. Law 11–52, 42 D.C.Reg. 3684.

10. Law 8–234, *supra* note 9, was adopted in part to expressly include coverage of real estate transactions which we held were not covered by the previous version of the law. *See Owens v. Curtis*, 432 A.2d 737 (D.C.1981).

instead, the money is] used for unrelated purposes such as directly or indirectly generating profits to AARP and paying extraordinary salaries to or providing other benefits to its officers and directors." Schiff contends that this practice constitutes misrepresentation by AARP to its members, and that "[s]uch a misrepresentation is material to a member who believes in good faith that she is getting the lowest possible price from the AARP."

█ To sustain his claim that AARP has perpetrated a fraud, Schiff must show that AARP 1) made a false representation of or willfully omitted a material fact; 2) that AARP. had knowledge of the misrepresentation or willful omission; 3) that AARP intended to induce Schiff to rely on the misrepresentation or willful omission; 4) that Schiff acted in reliance on that misrepresentation or willful omission; and 5) that Schiff suffered damages as a result of his reliance. *Howard v. Riggs Nat'l Bank,* 432 A.2d 701, 706 (D.C.1981).

Schiff's claim of fraud fails because he has not alleged sufficient facts to establish the first element of a claim of fraud, *i.e.,* that AARP made a false representation of or willfully omitted a material fact.[11] First, receipt of an "allowance" by a nonprofit corporation does not convert that entity into a "for" profit organization. *See Kozup, supra.* Second, AARP did not fail to disclose to its members the fact that some of its activities generated a significant amount of income.[12] It is not disputed that AARP disclosed to its

members that it received an allowance and interest from its insurance and investment programs, and that the income is used for the "general purposes of AARP and its members." Nowhere in his complaint does Schiff allege that this representation was not fulfilled, other than the claim concerning payments of sums to officers and directors. But that claim establishes nothing. Presumably the officers and directors expected to be compensated, and there is no contention that the amount they received exceeded that which they were legally authorized to be paid. Finally, that a member "believes in good faith that she is getting the lowest possible price from AARP" does not create a cause of action unless AARP had represented that it provides the lowest price for its services and products. There is nothing in this record showing that AARP made such a representation to its members.

Thus, Schiff has not sufficiently alleged a misrepresentation on the part of AARP. Therefore, having failed to establish all the "requisite elements" for a claim of fraud, *Howard, supra,* the trial court did not err when it dismissed Schiff's claim of common law fraud.

### IV.

Because, for the reasons stated, the trial court did not err in dismissing the complaint, the judgment is

*Affirmed.*

---

11. In resolving the fraud claim, the trial court ruled that, because the District had issued AARP a certificate of incorporation in accordance with D.C.Code § 29–533, *supra* note 1, only the District government had standing to challenge AARP's status as a nonprofit corporation. This ruling was based upon that portion of the statute that provides that it is "conclusive evidence that[, by virtue of the certificate of incorporation,] all conditions precedent required to be performed by the incorporators have been complied with and that the corporation has been incorporated under this chapter." Because we decide this issue on other grounds, we do not reach this question. We note that we do not understand Schiff to be contending that AARP acted improperly when it incorporated in the District of Columbia as a nonprofit organization pursuant to section 29–533.

12. Schiff makes much out of the fact that AARP received a substantial amount of money from its allowance and investment fees, hinting that AARP has been misleading in failing to advise its members of the great sums it retains. The amount of money generated, however, should come as no surprise to anyone who makes even a cursory examination of the numbers involved. For example, according to his complaint, Schiff pays nearly $7,000 annually for his long-term-care insurance. Simple arithmetic reveals that AARP will realize a substantial sum even if only a small number of its members also purchase the same insurance. For example, if only one percent (1%) of AARP's thirty two million members (320,000) purchased this insurance at $7,000 per person ($2,240,000,000), AARP's three percent (3%) allowance would produce $67,200,000.

WAGNER, Chief Judge, concurring in part and dissenting in part:

The majority concludes that AARP is exempt from coverage of the Consumer Protection Procedures Act (CPPA)[1] solely because it is a nonprofit corporation. With this aspect of the court's opinion, I disagree. The language of the CPPA does not exclude nonprofit corporations from its coverage. Coverage under the Act depends on the status of the organization as a merchant and the nature of its trade practices, not whether its charter designation is profit or nonprofit. The term "merchant" is defined broadly in the statute as

> a person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice[.]

D.C.Code § 28–3901(a)(3). A "person" includes, among others, a corporation "or any other organization, legal entity, or group of individuals however organized." D.C.Code § 28–3901(a)(1). Thus, this broad definition does not exclude nonprofit corporations, but includes corporations generally without any modifier.

This court did not hold otherwise in *Save Immaculata/Dunblane, Inc. v. Immaculata Prep. Sch.*, 514 A.2d 1152 (D.C.1986). In *Save Immaculata/Dunblane*, this court recognized that to recover under the CPPA, "it must be established that the [corporation] acted in the capacity of 'merchants' in operating the Immaculata and Dunblane schools." 514 A.2d at 1159. Although in granting summary judgment the court held that the plaintiff's claim failed under the CPPA because "a non-profit educational institution is not a 'merchant' within the context of the [Act]," nothing in the opinion suggests that it was intended to interpret the statute to exclude all non profits, whatever their nature or trade practices. Moreover, the court acted upon a motion for summary judgment in *Save Immaculata/Dunblane*, and the opinion does not disclose what undisputed facts led to the result reached.

In the case now before the court, we consider dismissal of a complaint under Super. Ct. Civ. R. 12(b)(6). Viewing the complaint in the light most favorable to Schiff, as we must, it does not appear beyond doubt that he can prove no facts which would entitle him to relief. *See Cauman v. George Washington Univ.*, 630 A.2d 1104, 1105 (D.C.1993). Schiff alleged in his complaint that AARP, although purportedly a nonprofit corporation, sold insurance to its members for which it earned substantial commissions from the insurance company, realizing substantial profits. We have held previously that automobile liability insurance is among the type of goods and services covered by the CPPA. *Atwater v. Department of Consumer & Reg. Affairs*, 566 A.2d 462, 467 (D.C.1989). We have also observed that where "the purchaser is not engaged in the regular business of purchasing [the] type of goods or service and reselling it, then the transaction will usually fall within the [CPPA]." *Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C.1989). The allegations of the complaint seem to place AARP in that category. The CPPA was " 'designed to police trade practices arising only out of consumer-merchant relationships.' " *Save Immaculata, supra*, 514 A.2d at 1159 (citing *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C.1981)). It would be contrary to the Act's broad purpose to hold that all nonprofit corporations are exempted from its coverage even if they act as merchants and engage in prohibited trade practices. *See Miller v. Risk Management Found.*, 36 Mass.App.Ct. 411, 632 N.E.2d 841, 845 (1994) (nominally charitable organization does not escape reach of consumer protection laws where, in fact, performing in a business way).

For these reasons, I respectfully dissent from that part of the opinion of the court which so holds. I join the majority opinion in all other respects.

---

1. D.C.Code §§ 28–3901 to 28–3908 (1996).