**HOLLY SUGAR CORPORATION, et al., Plaintiffs,**

v.

**Ann M. VENEMAN, Secretary, U.S. Department of Agriculture, et al., Defendants.**

**No. CIV.A. 03–1739(RBW).**

United States District Court, District of Columbia.

Sept. 15, 2004.

Dale E. McNiel, Washington, DC, for Plaintiffs.

Alan Burch, U.S. Attorney's Office, Washington, DC, for Defendants.

### MEMORANDUM OPINION

WALTON, District Judge.

The plaintiffs are challenging the defendants' interpretation of § 163 of the Federal Agricultural Improvement and Reform Act of 1996, Pub.L. No. 104–127, 110 Stat. 935, ("FAIR Act" or "1996 Act"), as amended by § 1401(c)(2) of the Farm Se-

curity and Rural Investment Act of 2002, Pub.L. No. 107–171, 116 Stat. 187 ("FSRI Act" or "2000 Act"), codified as amended at 7 U.S.C. § 7283, as applied to loans made by the Commodity Credit Corporation ("CCC") to sugar producers. Amended Complaint for Declaratory Judgment, Restitution and Injunctive Relief ("Compl.") ¶¶ 1–6. Currently before this Court are (1) the Defendant's Motion to Dismiss ("Def.'s Mot.") and (2) the Plaintiffs' Motion for Summary Judgment and Opposition to Defendant's Motion to Dismiss ("Pls.' Opp'n"). For the following reasons, this Court grants in part and denies in part the plaintiffs' motion for summary judgment and grants in part and denies in part the defendants' motion to dismiss.

## I.  *Background*

Beginning in the 1940s and continuing to the present, Congress has provided loan assistance to farmers to "support" the prices of agriculture commodities.[1]  *See* Agricultural Act of 1949, Pub.L. No. 81–438, 63 Stat. 1051; Defendant's Statement of Points and Authorities in Support of Her Motion to Dismiss ("Def.'s Mem.") at 2–3. The United States Department of Agriculture ("USDA"), through the CCC, makes these loans to, among others, sugar producers in order to support the price of sugar.[2]  *See* 7 U.S.C. §§ 7272, 7991(a). In 1988, the CCC promulgated a regulation that established a uniform policy for assessing interest on such loans. The regu-

lation provided that the interest rate that the CCC would charge on agricultural loans would be the same rate the United States Treasury charged the CCC to borrow the funds to finance the loans, which was the formula in effect on October 1, 1995.  *See* 7 C.F.R. § 1405.1 (1989). This regulation, which has since been amended, was promulgated based upon the CCC's interpretation of 15 U.S.C. §§ 714b(1) and 714c(a), (d), provisions which list the general and specific powers of the CCC. Def.'s Mem. at 4–5. Under § 714b(1), the CCC "[m]ay make such loans and advances of its funds as are necessary in the conduct of its business." And pursuant to § 714c, the CCC is required to "[s]upport the prices of agricultural commodities through loans, purchases, payments, and other operations" and "[r]emove and dispose of or aid in the removal or disposition of surplus agricultural commodities." 15 U.S.C. § 714c(a), (d).

However, in 1996, Congress passed the FAIR Act. Under this Act, Congress mandated that the CCC set interest rates for loans, including loans to sugar producers, at a rate equal to the rate it cost the CCC to borrow the funds from the United States Treasury, plus an additional 100 basis points, or one percent. 7 U.S.C. § 7283(a); § 163 of the 1996 Act. The provisions specifically stated: "Notwithstanding any other provision of law, the monthly Commodity Credit Corporation interest rate applicable to loans provided

---

1.  Congress has provided loan support for agricultural commodities, and in particular sugar, by making non-recourse loans. 7 U.S.C. § 7272(e). With regard to related sugar commodities, these loans require sugar producers to provide sugar as collateral, *see* 7 C.F.R. § 1435.103(a)(3), as a condition for receiving the loans. In the event of a loan default, the CCC has no legal recourse to require repayment, but it can sell the sugar submitted as collateral on the open market. 7 C.F.R. § 1435.105. The purpose of such loans are to

help stabilize, support and protect farm income and prices and for the "maintenance of balanced and adequate supplies of agricultural commodities . . . ." 15 U.S.C. § 714.

2.  Specifically, the CCC provides loans to processors of domestically grown sugarcane and sugar beats, which are being collectively referred to by the Court as "sugar" and the loans to such processors as "sugar loans." 7 U.S.C. § 7272(a), (b).

for agricultural commodities by the Corporation shall be 100 basis points greater than the rate determined under the applicable interest rate formula in effect on October 1, 1995." 7 U.S.C. § 7283(a). The CCC amended its regulations to reflect this Congressionally mandated change. *See* 7 C.F.R. § 1405.1 (1997).

In 2002, Congress again amended the loan program with the adoption of the FSRI Act, Pub.L. No. 107–171, 116 Stat. 187 (codified at 7 U.S.C. § 7283) ("2002 Act"). The 2002 Act added the following subsection to 7 U.S.C. § 7283: "(b) Sugar—*For purposes of this section,* raw cane sugar, refined beet sugar, and in-process sugar eligible for a loan under section 7272 of this title shall not be considered an agricultural commodity." 7 U.S.C. § 7283(b) (emphasis added). The 2002 Act did not alter subsection (a) of § 7283, which requires that 100 basis points be added to the interest rate on the loans, nor did the 2002 Act alter the ability of sugar producers to secure agricultural commodity loans under 7 U.S.C. § 7272 (discussing loan program for sugar). The amendment simply exempted sugar from the 100 basis point requirement. The 2002 Act also added the following, a no net cost provision, to 7 U.S.C. § 7272:

> (g)(1) IN GENERAL—Subject to subsection (e)(3), to the maximum extent practicable, the Secretary shall operate the [loan] program established under this section at no cost to the Federal Government by avoiding the forfeiture of sugar to the Commodity Credit Corporation.

7 U.S.C. § 7272(g)(1).

Despite this more recent amendment of § 7283(b), the CCC and the USDA concluded that the legislation did not mandate a new interest formula for sugar, but merely lifted the requirement of the 100 basis point premium, and thus they could charge whatever interest rate they deemed appropriate. The CCC published its reasoning in the Federal Register:

> The 2002 Act eliminates the requirement that CCC add 1 percentage point to the interest rate as calculated by the procedure in place in 1996 but does not establish a sugar loan interest rate. CCC has decided to use the rates required for other commodity loans.

67 Fed.Reg. 54,927 (Aug. 26, 2002). Based upon this reasoning, the CCC has continued to charge an additional one percent on sugar loans.

## II. *The Parties' Arguments*

The plaintiffs have filed a four count complaint challenging the defendants' continued assessment of an additional one percent on sugar loans despite the 2002 Act. Specifically, the plaintiffs allege that the defendants' actions (1) violate the express terms of the 2002 Act; (2) are arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A); (3) result in unjust enrichment to the United States; and (4) amount to an unconstitutional tax. Compl. ¶¶ 48, 51, 61, 67. Thus, the plaintiffs seek (1) a declaratory judgment that the defendants' actions violate the 2002 Act and the Constitution; (2) an injunction prohibiting the defendants from continuing to charge the additional one percent on sugar loans; and (3) an order directing the defendants to pay restitution to the plaintiffs in an amount equal to the amount the defendants have been unjustly enriched through the collection of the additional one percent interest assessment. Compl. ¶¶ A., B., C.

The defendants have moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Specifically, the defendants argue that the plaintiffs' APA claim must fail because there is no ambiguity in the stat-

ute at issue. Def.'s Mem. at 11. The defendants note that the 2002 Act removed sugar from the definition of "agricultural commodity," which they opine left the CCC free of any requirement to use a particular formula for setting interest rates on sugar loans. *Id.* at 11–12. Thus, the defendants posit that the CCC has the authority to charge whatever interest rate it deems appropriate so long as the interest rate is consistent with the CCC's general and specific powers listed in 15 U.S.C. §§ 714b(j), (k); 714c(a), (d). *Id.* Therefore, the defendants contend that this Court must give deference to the agency's decision as required by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Id.* at 14. The defendants further argue that the additional one percentage point interest fee is not a tax under the Constitution as the plaintiffs contend, but rather, is a permissible fee associated with the loan process. *Id.* at 14–17. Finally, the defendants assert that the plaintiffs' claim of unjust enrichment cannot survive their motion to dismiss because (1) the plaintiffs do not assert that the loan agreement has been breached and (2) the government is shielded from recovery on this claim by the doctrine of sovereign immunity. *Id.* at 17–18.

The plaintiffs have moved for summary judgment pursuant to Rule 56(a). Pls.' Opp'n at 23. The plaintiffs contend that the CCC's interpretation of the 2002 Act is contrary to the plain language of the Act and should, therefore, not be given *Chevron* deference. *Id.* at 25. The plaintiffs opine that Congress placed the sugar exemption in the same statutory provision that mandates the additional one percent interest charge in order to specifically exempt sugar from that additional one percent requirement, thereby reducing the interest rate charged on sugar loans. *Id.* The plaintiffs argue that this reading is supported by the plain language of the statute and application of basic cannons of statutory construction. *Id.* at 26. The plaintiffs further argue that the legislative history supports their reading of the statute. *Id.* at 26–27. They also state that the additional one percent interest charge is an unconstitutional tax because it is a payment that "is arbitrary and was created solely for a public purpose." *Id.* at 37. Finally, the plaintiffs posit that the CCC is being unjustly enriched by the assessment because it has illegally collected payments from the plaintiffs. *Id.* at 39. Therefore, the plaintiffs claim that they are entitled to restitution in an amount equal to the amount the CCC has been unjustly enriched. *Id.* at 39–40.

### III. *Standards of Review*

### (A) Motion to Dismiss Under Rule 12(b)(1)

Under Rule 12(b)(1), which governs motions to dismiss for lack of subject matter jurisdiction, "[t]he plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence." *Pitney Bowes, Inc. v. United States Postal Serv.,* 27 F.Supp.2d 15, 18 (D.D.C.1998). In reviewing such a motion, this Court must accept as true all the factual allegations contained in the complaint. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Additionally, in deciding a Rule 12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case. *See EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624–25 n. 3 (D.C.Cir.1997); *Herbert v. Nat'l Academy of Sciences.,* 974 F.2d 192, 197 (D.C.Cir. 1992); *Haase v. Sessions,* 835 F.2d 902,

906 (D.C.Cir.1987); *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 14 (D.D.C.2001).

### (B) Motion to Dismiss Under Rule 12(b)(6)

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Barr v. Clinton,* 370 F.3d 1196, 1199 (D.C.Cir. 2004) (citing *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir. 1994)). However, the Court need not accept asserted inferences or conclusory allegations that are unsupported by the facts set forth in the complaint. *Kowal,* 16 F.3d at 1276. In deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference into the complaint, and matters about which the Court may take judicial notice. *St. Francis,* 117 F.3d at 624–25. The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99.

### (C) Motion for Summary Judgment Under Rule 56(a)

This Court will grant a motion for summary judgment under Rule 56(c) if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits or declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party. *Bayer v. United States Dep't of Treasury,* 956 F.2d 330, 333 (D.C.Cir.1992).

### (D) *Chevron* Deference

Under the APA, 5 U.S.C. § 706(2)(A), this Court may vacate a decision by the USDA only if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." This standard is highly deferential to the agency. *See Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). *Chevron* deference applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *see also Robert Wood Johnson Univ. Hosp. v. Thompson,* 297 F.3d 273, 281 (3d Cir.2002). The Court is required to apply a two-step analysis pursuant to *Chevron.* First, "if the statute speaks clearly 'to the precise question at issue,'[the Court] 'must give effect to the unambiguously expressed intent of Congress.'" *Barnhart v. Walton,* 535 U.S. 212, 217–18, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (quoting *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778). Second, where the statute is "silent or ambiguous with respect to the specific issue," courts must sustain the agency decision if it is based on a "permissible construction" of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. A court does not need to reach this second step, however, if "employing traditional tools of statutory construction, [it] ascertains that Congress had an intention on the precise question at issue ...." *Id.* at 843 n. 9, 104 S.Ct. 2778.

## IV. *Legal Analysis*

### (A) Is the USDA's Decision Entitled to *Chevron* Deference?

This Court agrees with the parties' position that the plain language of the statute clearly and unambiguously indicates Congress' intent, therefore, this Court need not address *Chevron's* second-prong. Def.'s Mem. at 11; Pls.' Opp'n at 25. The defendants contend that the 2002 Act only removed sugar from the definition of "agricultural commodity" for the limited purpose of 7 U.S.C. § 7283. Def.'s Mem. at 11. Thus, by removing sugar from that section, the defendants opine that Congress' intent was to give the CCC authority to utilize any formula it deemed appropriate in determining the loan rate for sugar, so long as it was within the scope of the CCC's general and specific powers. *Id.* at 12. The plaintiffs contend, however, that by removing sugar from the definition of "agricultural commodity," Congress intended for sugar to be treated differently than other agricultural commodities. Pls.' Mem. at 26. Thus, according to the plaintiffs, the additional one percent that the CCC continues to charge on sugar loans is clearly contrary to the current version of § 7283(b) as doing so renders the 2002 amendments meaningless. *Id.* Furthermore, the plaintiffs opine that it is clear from the legislative history of the amendments that Congress intended for the interest rate on sugar loans to be reduced. *Id.* at 26–27.

In determining whether *Chevron* deference should be accorded agency action, this Court must first determine, by "employing traditional tools of statutory construction," whether "Congress had an intention on the precise question at issue . . . ." *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778. "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *United States*

*v. Goldenberg,* 168 U.S. 95, 102–03, 18 S.Ct. 3, 42 L.Ed. 394 (1897). "[I]t is an elementary principle of statutory construction that, in construing a statute, [this Court] must give meaning to *all* the words in the statute." *Lewis v. Barnhart,* 285 F.3d 1329, 1332 (11th Cir.2002) (per curiam) (citations omitted) (emphasis in original). "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Trustee,* 540 U.S. 526, ——, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004). Thus, in such situations, "resort to legislative history is not appropriate in construing the plain statutory language." *United States ex rel. Totten v. Bombardier Corp.,* 380 F.3d 488, 493 (D.C.Cir.2004). However, when examining the plain meaning of the statute, the Court must not interpret the statute in such a manner that renders another part of that statute or another statute superfluous. *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 35, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). Furthermore, when faced with both a specific and general provision, this Court should interpret the provisions so that the specific statute controls. *Edmond v. United States,* 520 U.S. 651, 657, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997). If the plain meaning of the statute leads to an "absurd or futile result[ ], however, [the Supreme] Court has looked beyond the words to the purpose of the act." *Perry v. Commerce Loan Co.,* 383 U.S. 392, 400, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966) (quoting *United States v. American Trucking Ass'ns.,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)). The District of Columbia Circuit has held that "literal interpretation need not rise to the level of 'absurdity' before recourse is taken to the legislative history, . . . [but] there must be evidence that Congress meant something other than what it literally said before a

court can depart from plain meaning." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C.Cir.1996).

■ In this case, the Court need not reach the second *Chevron* question because it concludes, as both parties do, albeit from different perspectives, that the Congress' intent is clear. Without question, 7 U.S.C. § 7283(a) limits the CCC's authority to set interest rates for loans on agricultural commodities. This provision clearly requires that the interest rate on such loans be one percent greater than the rate charged to the CCC by the United States Treasury to borrow the funds to finance the loans. Thus, the section mandated a one percent *increase* above the rate that the CCC charges on all *agricultural commodity* loans pursuant to the pre-existing formula. Prior to the 2002 Act, this one percent add on undoubtedly applied also to loans for sugar commodities. However, pursuant to the 2002 Act, as codified in 7 U.S.C. § 7283(a)-(b), sugar loans are expressly exempted from the imposition of the one percentage point increase. The 2002 Act did not in any other way affect the ability of sugar producers to seek loan assistance through the CCC, the Act simply altered the interest rate for such assistance. By specifically mandating that the increase would no longer apply to sugar, Congress clearly intended for the interest rate for sugar loans to be *decreased* by one percent. To conclude otherwise would render meaningless Congress' unambiguous amendment contained in the 2002 Act.

The CCC maintains, however, that because Congress did not specifically state what the interest rate for sugar should be, but rather only indicated what it should not be, Congress gave the CCC authorization to charge any rate it deemed appropriate so long as that rate is in line with the CCC's general and specific powers codified at 15 U.S.C. §§ 714b(1) and 714c(a), (d). Def.'s Mem. at 11–12. Thus, pursuant to these statutory powers, the CCC argues that it is permitted to charge the additional one percent over the rate charged to it by the United States Treasury. *Id.* Despite the CCC's creative argument, Congress' intent was clear—the interest rate on sugar is now exempt from the additional one percent interest rate increase and thus, the rate is decreased by one percent. Thus, when reduced by one percent, the net effect of the 2002 Amendment is that the interest loan rate for sugar is the amount calculated by using the interest rate formula in effect on October 1, 1995, or the same rate that the CCC pays to the United States Treasury to borrow the fund to finance the loans. If this Court were to conclude that the CCC could impose the additional one percent pursuant to its statutory powers set forth in 15 U.S.C. §§ 714b(1) and 714c(a), (d), despite Congress' mandate otherwise, it would be interpreting the statute in such a way that would give no effect to 7 U.S.C. § 7283(b) as now drafted, thus making it superfluous, which this Court cannot do. *See Dastar Corp.*, 539 U.S. at 35, 123 S.Ct. 2041. Furthermore, even if this Court could conclude that the CCC's statutory powers under 15 U.S.C. §§ 714b(1) and 714c(a), (d) permit the CCC to set interest rates, these powers are clearly not specific to the precise issue presented to the Court here, *i.e.*, whether the CCC may charge an additional one percent where 7 U.S.C. § 7283 clearly indicates otherwise. Thus, this Court cannot read the general statutory provision governing the CCC's powers as trumping the more specific and clear interest provision of 7 U.S.C. § 7283.[3] *See Edmond*, 520 U.S. at 657, 117 S.Ct. 1573.

---

**3.** The defendants also rely on the 2002 Act's no net cost provision as support for its contention that the CCC has the ability to charge whatever interest rate it deems appropriate so long as the rate is within the scope of the

For the foregoing reasons, the CCC's decision to charge an additional one percent on sugar loans is contrary to the clear language of the 2002 Act, as codified in 7 U.S.C. § 7283.[4] Therefore, this Court affords no deference to the agency's interpretation of the 2002 amendment and it must grant the plaintiffs' motion for summary judgment with respect to counts one and two of the amendment complaint and deny the defendants' motion to dismiss these two counts.[5]

## (B) Can the Plaintiffs Maintain Their Claim for Unjust Enrichment Against the Government?

In count three of the amended complaint, the plaintiffs contend that the additional one percent assessment has resulted in the defendants being unjustly enriched. Compl. ¶ 58. Thus, the plaintiffs seek restitution in the amount equal to the amount the defendants have allegedly been unjustly enriched. Compl. ¶ C. The defendants have moved to dismiss this count of the amended complaint because they claim that the doctrine of sovereign immunity bars the claim. Def.'s Mem. at 18. Additionally, the defendants, by directing this Court to *Albrecht v. Commit-*

*tee of Employee Benefits,* 357 F.3d 62 (D.C.Cir.2004), appear to argue that unjust enrichment in not an appropriate claim when there is an express contract, *i.e.,* the loan agreements, that specifically addresses the question at issue, *i.e.,* the interest rate payable on the loans. Defendants' Notice of Supplemental Authority. Assuming, without deciding, that sovereign immunity has been waived, this Court is compelled to grant the defendants' motion to dismiss.

" 'The doctrine of unjust enrichment has at all times been fundamentally equitable in nature, notwithstanding its long association with the law of contracts.' " *In re Lorazepam & Clorazepate Antitrust Litigation,* 295 F.Supp.2d 30, 50 (D.D.C.2003) (quoting *BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil,* 56 F.Supp.2d 14, 64 (D.D.C.1999)). In order to state a claim for unjust enrichment, the plaintiffs "must establish that: (1) they conferred a legally cognizable benefit upon [the] [d]efendants; (2)[the][d]efendants possessed an appreciation or knowledge of the benefit; and (3)[the][d]efendants accepted or retained the benefit under inequitable circumstances." *Id.* (citing *Int'l Bhd. of Teamsters, Chauffeurs, Ware-*

---

CCC's statutory powers codified at 15 U.S.C. §§ 714b(1) and 714c(a), (d). Def.'s Mem. at 13. However, the defendants' argument has no merit since it is clear that 7 U.S.C. § 7283 speaks directly and specifically to the issue in dispute—the rate which the CCC can charge to fund sugar loans—while the no net cost provision, 7 U.S.C. § 7272(g)(1), is merely a general provision requiring that the CCC strive to operate the loan existence program, "to the maximum extent practicable[,] ... at no cost to the Federal Government." *See Edmond,* 520 U.S. at 657, 117 S.Ct. 1573.

4. While this Court need not engage in a review of the legislative history to reach this conclusion, the legislative history on point provides further support for this Court's holding. *See* S.Rep. No. 107–117, at 100 (2001) (stating that the 2002 Act "reduces the CCC

interest rate on sugar loans by 100 basis points"); H.R.Rep. No. 107–191, pt. I at 89 (2001) (noting that the 2002 Act "reduces the CCC interest rate on price support loans"); *To Review the Implementation of the 2002 Farm Bill: Hearing Before the Senate Committee on Agriculture, Nutrition, and Forestry,* 108th Cong. at 20 (2003) (statement of Senator Conrad) (discussing the repeal of the interest rate "surcharge" and concluding: "[n]ow why ever would we have repealed it if we did not intend for that to actually be implemented?").

5. Because the Court concludes that the defendants' actions were contrary to the plain language of the statute, it will not address the plaintiffs' claim that the additional one percent was an unconstitutional tax.

*housemen, & Helpers of Am. v. Ass'n of Flight Attendants, AFL–CIO,* 864 F.2d 173, 177 (D.C.Cir.1988)). " 'To qualify for an award of restitution under th[e] theory [of unjust enrichment], [the plaintiffs] must show that [they] conferred a benefit (usually money) on [the defendants] under circumstances in which it would be unjust or inequitable for [the defendants] to retain the benefit.' " *Id.* at 50–51 (quoting *BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil,* 56 F.Supp.2d 14, 64–65 (D.D.C.1999) (citations omitted)). However, "there can be no claim for unjust enrichment when an express contract exists between the parties." *Albrecht. v. Committee on Employee Benefits,* 357 F.3d 62, 69 (D.C.Cir.2004) (citing *Schiff v. American Ass'n of Retired Persons,* 697 A.2d 1193, 1194 n. 2 (D.C.1997)); *see Seafarers Welfare Plan v. Philip Morris,* 27 F.Supp.2d 623, 635–36 (D.Md.1998).

The District of Columbia Circuit discussed the implications of an existing contract on an unjust enrichment claim in *Albrecht,* 357 F.3d at 62. There, the plaintiffs alleged, *inter alia,* that the Board of Governors of the Federal Reserve System had been unjustly enriched and sought "the return of [the] mandatory contributions that [the plaintiffs] made into a de-

fined-benefit pension plan after actuaries determined the plan was well-funded." *Id.* at 64. When discussing the unjust enrichment claim, the District of Columbia Circuit held, relying on *Schiff,* 697 A.2d at 1194, that "there can be no claim for unjust enrichment when an express contract exists between the parties." *Id.* at 69 (citing *Schiff,* 697 A.2d at 1194). Thus, because the pension plan governed the various aspects of the relationship between the parties, and nothing in that contract required the defendants to make refunds to employees if the plan had a surplus, "any 'enrichment' the [defendants] would enjoy if the [plaintiffs] receive[s] surplus funds could not possibly be unjust." *Id.* at 69.

Here, the plaintiffs were under legal obligations, arising from the loan agreements, to pay the interest rates designated in those agreements. The plaintiffs do not allege that the contracts have been breached or should be voided or that some other "quasi-contract" existed. Thus, the plaintiffs in this case are in the same position as the plaintiffs in *Albrecht. See id.* And accordingly, because an express contract exists, the plaintiffs claim for unjust enrichment has no legal foundation as there can be no such actionable claim since the controversy is covered by an express contract.[6] *See Albrecht,* 357 F.3d at 69.

---

**6.** This result might seem harsh, since this Court has previously concluded that the interest rates designated in the loan agreements were greater than permitted by law. Had the plaintiffs, for example, sought to void the loan agreements, *see, e.g., American Airlines v. Austin,* 75 F.3d 1535, 1538 (Fed.Cir.1996) ("[g]enerally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void."), a quasi-contract might be implied to exist, which would provide a basis for an unjust enrichment claim. *See, e.g., United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.,* 81 F.3d 240, 247 (D.C.Cir.1996) ("[u]njust enrichment ... rests on a contract implied in law, that is, on the principle of quasi-contract"). However, no such claim was made in this case. Furthermore, had the plaintiffs sought injunctive

relief, they might have been relieved by the Court from making payments on the loans when the case was first filed. Finally, this Court notes that the plaintiffs' claim for a refund of any overpayments under the loan agreements may still be actionable in the Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(1); *see, e.g., Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1578 (Fed.Cir. 1996) ("the Tucker Act provides jurisdiction to recover the sums exacted illegally by the [Immigration and Naturalization] Service due to its misinterpretation or misapplication of statutes ...."); *Unisys Corp. v. United States,* 48 Fed. Cl. 451, 455 (Fed.Cl.2001) (holding that the government was required to refund quarterly contingency payment to the plaintiff

Therefore, the defendants' motion to dismiss count three of the amended complaint must be granted.[7]

## V. Conclusion

For the foregoing reasons, this Court concludes that the defendants' additional one percent interest rate assessment on the sugar loans made to the plaintiffs is contrary to the express language of the 2002 Act and is "arbitrary, capricious, ... or otherwise not in accordance with law" and therefore a violation of the APA, 5 U.S.C. § 706(2)(A). Thus, the plaintiffs are entitled to judgment as a matter of law on counts one and two of their amended complaint.[8] Furthermore, because an express contract defined the terms of the sugar loans, including the payable interest rate, the third count of the amended complaint—their claim for unjust enrichment—must be rejected as a matter of law.

**SO ORDERED** this day of 15th day of September, 2004.[9]

that were made in excess of the contracted amount).

7. Because this Court concludes that the plaintiffs have failed to state a claim upon which relief can be granted with respect to the unjust enrichment claim, it will not address the defendants' arguments that the claim is barred by the doctrine of sovereign immunity.

8. As noted earlier, because this Court has concluded that the defendants' actions violate both the express terms of the 2002 Act and the APA, 5 U.S.C. § 706(2)(A), it need not reach the issue raised in Count Four of the amended complaint—whether the interest rate amounted to an unconstitutional tax.

9. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.