# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 8, 2005        Decided February 7, 2006

No. 05-5067

HOLLY SUGAR CORPORATION, ET AL.,
APPELLEES

v.

MICHAEL JOHANNS, IN HIS OFFICIAL CAPACITY AS SECRETARY
OF AGRICULTURE AND AS CHAIRMAN OF THE COMMODITY
CREDIT CORPORATION,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01739)

---

*Alan Burch*, Assistant U.S. Attorney, U.S. Attorney's Office, argued the cause for appellant. With him on the briefs were *Kenneth L. Wainstein*, U.S. Attorney, and *Michael J. Ryan*, Assistant U.S. Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Dale E. McNiel* argued the cause for appellee. With him on the brief was *Erik S. Jaffe*.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:  Appellees, a group of sugar processors, receive sugar loans from the federal government. Until 1996, interest rates for all agricultural commodity loans, including sugar, were set by regulations promulgated by the agency charged with administering the loans, the Commodity Credit Corporation (CCC).  In that year, however, Congress set the rate by statute, increasing it by one percentage point over the regulatory rate.  Six years later, in 2002, Congress exempted sugar from the statutory rate, but the CCC kept the rate the same.  Believing that the 2002 statute required a lower interest rate, the sugar processors filed suit, and the district court ordered the CCC to reduce the rate.  We reverse.  Nothing in the 2002 statute sets an interest rate.  Instead, it merely restores the CCC's rate-setting authority.

## I.

The Commodity Credit Corporation runs the nation's "sugar program."  7 U.S.C. § 7272 (creating sugar program), *id.* § 7991(a) (assigning it to the CCC).  Federal loans to sugar processors form the core of this program.  For example, the statute provides that "[t]he Secretary shall make loans available to processors of domestically grown sugarcane at a rate equal to 18 cents per pound for raw cane sugar." *Id.* § 7272(a); *see also id.* § 7272(b) (analogous language for refined beet sugar with rate at "22.9 cents per pound").  Secured by sugar produced by the processors, these loans are nonrecourse, *id.* § 7272(e)(1), meaning that if the processors default, the government's only remedy is to foreclose on the sugar. *See* 7 C.F.R. § 1435.105(b). Thus, if the price of raw cane sugar falls below 18 cents per pound, the processors simply default on the loan, in essence selling their sugar to the government.

For many years, the statute remained silent on the interest rate for these loans, and the CCC set the interest rate for each loan individually. In 1988, a CCC regulation set a uniform rate for all agricultural loans at "the rate of interest charged by the U.S. Treasury for funds borrowed by CCC." Price Support Loans and Purchases, Production Adjustment Programs, and Other Operations, 53 Fed. Reg. 47,658, 47,659 (Nov. 25, 1988) (codified as amended at 7 C.F.R. § 1405.1). The CCC issued this regulation under its statutory authority to "make such loans . . . as are necessary in the conduct of its business," 15 U.S.C. § 714b(*l*), and to "[s]upport the prices of agricultural commodities through loans, purchases, payments, and other operations," *id.* § 714c(a).

So things remained until the Federal Agriculture Improvement and Reform Act of 1996 (FAIR) which, for the first time, set the interest rate by statute:

> Notwithstanding any other provision of law, the monthly Commodity Credit Corporation interest rate applicable to loans provided for agricultural commodities by the Corporation shall be 100 basis points greater than the rate determined under the applicable interest rate formula in effect on October 1, 1995.

Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, § 163, 110 Stat. 888, 935 (codified as amended at 7 U.S.C. § 7283(a)). Because the "applicable interest rate formula" was the Treasury rate, the 1996 legislation effectively set the interest rate at one percentage point above the Treasury rate. The CCC amended its regulations to reflect this change. Implementation of the Farm Program Provisions of the 1996 Farm Bill, 61 Fed. Reg. 37,544, 37,575 (July 18, 1996) (codified at 7 C.F.R. § 1405.1).

Up to this point, sugar loans carried the same interest rate as all other agricultural loans. But Congress changed that in 2002 by appending the following language to section 7283, the section that set the interest rate:

> For purposes of this section [i.e., section 7283], raw cane sugar, refined beet sugar, and in-process sugar eligible for a loan . . . shall not be considered an agricultural commodity.

Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 1401(c)(2), 116 Stat. 134, 187 (codified at 7 U.S.C. § 7283(b)). The 2002 Act also required the CCC to promulgate implementing regulations, which it exempted from the Administrative Procedure Act's notice and comment provisions. *Id.* § 1601(c), 116 Stat. at 211-12 (codified at 7 U.S.C. § 7991(c)).

The sugar processors expected the interest rate, once freed of the statutory requirement to exceed the Treasury rate, to return to its pre-1996 level. The CCC's response to the 2002 Act therefore must have come as quite a surprise. "The 2002 Act," the CCC explained, "eliminates the requirement that CCC add 1 percentage point to the interest rate as calculated by the procedure in place in 1996 but does not establish a sugar loan interest rate. CCC has decided to use the rates required for other commodity loans." 2002 Farm Security and Rural Investment Act of 2002 Sugar Programs and Farm Facility Storage Loan Program, 67 Fed. Reg. 54,926, 54,927 (Aug. 26, 2002). Having decided the interest rate for sugar should remain at one percentage point above the Treasury rate, the CCC made no change to its interest rate regulation.

Seventeen sugar processors then filed suit in U.S. District Court, arguing that the 2002 Act required the CCC to lower the

sugar interest rate. They sought declaratory relief and an injunction prohibiting the CCC from imposing an interest rate other than the Treasury rate as well as restitution for interest they had already paid in excess of the Treasury rate. The district court granted their motion for summary judgment, explaining that the CCC's interpretation would render the 2002 Act "meaningless" or "superfluous," and ordered declaratory and injunctive relief. *Holly Sugar Corp. v. Veneman*, 335 F. Supp. 2d 100, 107 (D.D.C. 2004), *modified*, 355 F. Supp. 2d 181 (D.D.C. 2005). Although the district court initially denied restitution, 335 F. Supp. 2d at 108-10, it later changed its mind, 355 F. Supp. 2d at 190-96. The CCC now appeals, challenging both the district court's interpretation of the CCC's statutory mandate and its restitution award. We review the district court's grant of summary judgment de novo. *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002).

## II.

As all parties agree, we consider the CCC's interpretation of a statute it administers under the two-part test of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). We ask first "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, we end our inquiry, giving "effect to the unambiguously expressed intent of Congress." *Id.* at 843. In determining whether a statutory provision speaks directly to the question before us, we consider it in context. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000). In addition, we must "exhaust the 'traditional tools of statutory construction.'" *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843 n.9). If, having conducted this analysis, we still find the statute silent or ambiguous on the issue before us, we move on to *Chevron*'s second step, asking "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

Here, the parties dispute the meaning of the 2002 Act's provision exempting sugar from the statutory interest rate. According to the CCC, this provision restored the rate-setting authority it held before the 1996 Act first imposed a statutory rate. The sugar processors contend that the provision restored the interest rate in effect before the 1996 Act, and that the CCC therefore has no authority to deviate from the Treasury rate.

Our analysis, of course, begins with the statute's language. Subsection (a), the portion of the statute enacted in 1996, sets an interest rate for all agricultural commodities. Subsection (b), the portion of the statute added in 2002, exempts sugar from that generic interest rate. On their face, then, the two sections together have no effect on sugar loans—subsection (b) exempts sugar from subsection (a), the only provision that sets an interest rate. It thus appears that the rate-setting authority for sugar has reverted to the CCC under its authority to "make . . . loans."

The processors insist that notwithstanding the statute's language, the CCC must impose the Treasury rate. Like the district court, the processors find significance in the fact that Congress enacted subsections (a) and (b) sequentially rather than simultaneously. They label subsection (a)'s enactment the "Interest Surcharge Act," *see* Appellees' Br. 3, and then conclude that through subsection (b) Congress exempted sugar from the "interest surcharge," thereby expressing its intent to restore the interest rate to its pre-1996 level. But "Interest Surcharge Act" is the processors' label, not Congress's, and the 1996 Act could just as easily be called the "Statutory Interest Rate Act" or even the "Strip the CCC of Authority Act." Exempting sugar from a provision described either of these two ways would restore the CCC's discretion, not the pre-1996 interest rate.

We also disagree with the district court's conclusion that the CCC's interpretation renders the 2002 Act "meaningless," *Holly Sugar*, 355 F. Supp. 2d at 188, or "superfluous," *id.* at 189. Under the CCC's interpretation, the agency has now regained its authority to set the sugar interest rate, authority it was given only when Congress passed the 2002 Act and which it lacks for all other agricultural commodities.

The processors also rely on the provision's legislative history. They emphasize most heavily a Senate report's statement that the 2002 Act "reduces the CCC interest rate on sugar loans by 100 basis points." S. Rep. No. 107-117, at 100 (2001). The House report, however, is far more equivocal. It explains that the provision "reduces the CCC interest rate on price support loans" without specifying how much. H.R. Rep. No. 107-191, pt. 1, at 89 (2001). The conference report gives the processors even less support. Mirroring the statute's language, that report states that the Act "makes section 163 of the FAIR Act inapplicable to sugar." H.R. Rep. No. 107-424, at 447 (2002) (Conf. Rep.). Taken together, these reports fall far short of the "extraordinary circumstances" in which a statute's unambiguous language might not control. *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) (quoting *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 474 (1992)). Indeed, of the three reports, only the Senate's gives any inkling that Congress may have had a particular interest rate in mind, and the conference report—to which we ordinarily ascribe the most weight, *see Moore v. District of Columbia*, 907 F.2d 165, 175 (D.C. Cir. 1990) (en banc) ("[the] conference committee report is the most persuasive evidence of congressional intent after [the] statutory text itself" (internal quotation marks omitted))—gives no indication whatsoever that Congress intended to restore the pre-1996 rate.

In short, contrary to the processors' argument, the statute sets no interest rate for sugar. Instead, it sets an interest rate for all other commodities and specifically exempts sugar. By removing sugar from the statutory rate, "Congress has directly spoken to the precise question" of how the rate should be set, namely, by the CCC. *Chevron*, 467 U.S. at 842. Thus agreeing with the CCC that Congress unambiguously gave it discretion over the sugar interest rate, we end our *Chevron* analysis at step one.

### III.

Because we disagree with the district court's reasoning, we must consider the processors' claim that even if the CCC has authority to set the rate, such authority does not extend to imposing an interest rate above the Treasury rate. *See EEOC v. Aramark Corp., Inc.*, 208 F.3d 266, 268 (D.C. Cir. 2000) ("[B]ecause we review the district court's judgment, not its reasoning, we may affirm on any ground properly raised."). The processors advance three arguments in support of this claim, none persuasive.

The processors first argue that the CCC has never before charged more than its estimated cost of borrowing, i.e., the Treasury rate. True enough, but that doesn't mean the CCC lacks authority to do so. Whether it has such authority turns on the meaning of the statutes we have been discussing, not the agency's past practices.

Next, the processors argue that the CCC has no explicit power to charge interest, and that its implied power to do so must be limited to furtherance of congressional policy. Accordingly, the processors assert, the rate decision falls outside the CCC's authority because charging an interest rate higher than the cost of borrowing creates a windfall for the CCC, a result that is inconsistent with the policies associated with

running a subsidy program. As the CCC points out, however, Congress mandated such an interest rate for six years and continues to mandate it for all other agricultural commodities, so it is hard to see how the CCC's rate conflicts with the program's goals.

Finally, the processors contend that the rate cannot be defended as a form of user fee. But because the rate is an interest rate, not a fee, this argument is irrelevant.

One last point. The processors nowhere argue that the CCC, in lumping sugar in with other agricultural commodities, acted arbitrarily and capriciously. Instead, they challenge only the agency's *authority* to set such a rate, not its *decision* to do so. To be sure, they describe the agency's explanation as "deficient, to say the least," Appellees' Br. 19, but they make this point only in support of their argument that the resulting interest rate "is plainly not an *outcome* that Congress would have sanctioned," *id.* at 20 (emphasis added). As the processors make no claim that the agency's selection of a particular interest rate was arbitrary and capricious, we need not address that possibility. *See Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000) (distinguishing between *Chevron* argument and argument that "even assuming the statute did not foreclose the [agency's] policy, it was nevertheless unreasonable").

Because the 2002 Act granted the CCC authority to set the interest rate for sugar, we reverse the district court's judgment. Our conclusion that the CCC acted within its discretion eliminates any need to consider the district court's restitution order.

*So ordered.*